JACKSON, *ex dem.* JOHNSTON AND OTHERS, *against* DECKER.

An *alien ene-my,* resident in the enemy's country, cannot, during the war, make a valid demise, so as to maintain an action of *ejectment* for lands, the title to which had been acquired under a statute of this state, (2d of *April,* 1798. sess. 21. c. 72.)

The statute merely secures to *aliens* the *title* to lands, and does not relate to the remedy.

The object of the statute was to destroy the plea of alienage, which might work a forfeiture of the title, and not a plea which merely *suspends* a right of action during a war between the two countries.

*Alienage* may be pleaded in bar or abatement; and may be given in evidence under the general issue.

THIS was an action of ejectment, for lot no. 44. in the township of *Junius,* in the county of *Seneca,* tried at the *Seneca* circuit, the 26th *May,* 1814, before Mr. Justice PLATT.

The declaration contained a demise from *Justus B. Smith,* on the 1st *January,* 1797, and several demises from other lessors, laid on the 1st *January,* 1812. There was also a joint demise from all the lessors on the same day.

The lessors gave in evidence a patent, to *John Decker,* for the lot in question, dated 13th *September,* 1790 ; and an exemplification of a deed from *Hendrick Decker* to *Peter B. Ten Brook,* dated the 14th of *March,* 1792, duly proved and recorded, describing the grantor as the heir at law of " *John Decker,* late a private in the *first* regiment of the line of the state of *New-York,* in the army of the *United States ;*" also sundry *mesne* conveyances from *Peter B. Ten Brook* to Sir *William Pulteney,* the deed to whom was dated the 13th *December,* 1800. It was proved that Sir *William Pulteney* died in *May,* 1805, leaving one child, *Henrietta Laura Pulteney,* Countess of *Bath,* who died in *July,* 1808, without issue, leaving Sir *John Lowther Johnston,* his heir at law, who was the only child of *George Johnston,* the eldest brother of Sir *William Pulteney,* and who died before Lady *Bath.* Sir *John Lowther Johnston* died in 1811, leaving *Frederick George Johnston, Charlotte Margaret Johnston,* and *Anne Elizabeth Johnston,* who are the other lessors of the plaintiff, his only children and heirs at law, and who are alien and native subjects of the King of *Great Britain,* and now reside in *England.*

Compensation had been duly tendered to the defendant, for improvements, agreeable to the act, (1 *N. R. L.* 304. sess. 36. c. 80.) before the commencement of the suit.

The defendant's counsel read in evidence the act of the 14th of *March,* 1797, "to settle disputes concerning the titles to lands in the county of *Onondaga ;*" (sess. 20. c. 51.) and the act of the 12th of *February,* 1798, to amend the former act;

and offered to read in evidence, from the printed journals of the house of assembly, the report of the *commissioners* appointed by the first-mentioned act, and which stated, among other things, that lot no. 44. in *Junius*, was granted to *John Decker*, of the fourth *New-York* regiment, which evidence was objected to, and overruled by the judge.

The defendant then produced witnesses as to the identity of the patentee, one of whom knew a *John Decker* in the *fourth* regiment of *New-York*, and another, a soldier of that name in the *second New-York* regiment.

It was admitted that the defendant was in possession under colour of title, and as a *bona fide* purchaser.

It was, also, objected on the part of the defendant, that the ancestors of the lessors, at their death, and the lessors themselves, were aliens, subjects of *Great Britain*, and residing in *Great Britain* at the commencement of the suit, and now resident there. This objection was overruled by the judge; and the jury found a verdict for the plaintiff, subject to the opinion of the court, on a case containing the facts above stated.

*Henry*, for the plaintiffs. There can be no doubt as to the identity of the original patentee; the person under whom the lessors derive title, was shown to be. the deceased soldier, to whom the land was granted.

As to the other objection; the printed journals of the assembly are not evidence, without proof of their having been compared with the originals.

The principal question is as to the *alienage* of the lessors. We admit the general principle that alien enemies, resident in the country of the enemy, cannot maintain an action in our courts. This objection is not, however, favoured, and ought to be pleaded strictly. Where the disability arises after suit brought, it must be pleaded *puis darrein continuance*, and cannot be given in evidence under the general issue. But this objection does not apply to the present case. By the act of the legislature, passed the 2d of *April*, 1798,(a) (sess. 21. c. 72.) all conveyances to aliens, not being the subjects of any power, at the time of the conveyance, at war with the *United States*, are declared to be valid, to vest the estate in such aliens, and they

(a) This act was limited, in its duration, to three years.

NEW YORK,
October, 1814.

JACKSON
v.
DECKER.

are to hold the same, notwithstanding any plea of alienism. The only exception is, that the party must not be an alien *enemy* at the time of the purchase; and the only restriction on the right thus granted is, that the grantee cannot lease or grant the estate, reserving rent or creating a tenancy. In every other respect, as perfect right was vested by this statute in grantees of land, who were aliens, as if they had been natural born citizens of this state. The public faith of the state was pledged by the grant. If, then, a perfect right was granted, it carries with it a perfect remedy. The subsequent intervening war cannot take away or impair the right or the remedy. So far as it regards the lands, so allowed to be held by aliens, they are regarded as citizens.*

*\* Vattel's Law of Nations, b. 2. c. 8. s. 114. b. 3. c. 5.s. 76.*

*† Co. Litt. 129. v.*

The act of 1798 is analogous to special letters of *denization*, by which an alien is enabled to sue.†

Again, by the 9th article of the treaty of amity, commerce, and navigation, made with *Great Britain*, the 19th of *November*, 1794, it is agreed that *British* subjects, holding lands in the *United States*, shall continue to hold them, and may grant and dispose of them as if they were native citizens; and that neither they nor their heirs or assigns should, as regards such lands, and the legal remedies incident thereto, be regarded as aliens.

If the lessors are within the scope of this treaty, the objection of alienage cannot be made.

Supposing, even, a right in the government to confiscate or sequester the property of an alien enemy, no individual could claim the benefit of such a right. It belongs to the general government, having the power to declare war and peace. But this is a subject which need not be discussed here.

*Kellogg*, contra. 1. The journals of the assembly ought to have been received in evidence. The votes of assembly, and the minutes of council, have been admitted in evidence in *Pennsylvania.‡* So the resolutions of congress were allowed to be received in evidence in the case of *Bingham* v. *Cabot*,§ in the supreme court of the *United States*.

*‡ 1 Dall. Rep. 9.*

*§ 3 Dall. Rep. 19. 39.*

A parish register, register of the navy-office, books in the herald's office, doomsday-book, prison-books, the log-book of a man of war, &c. have been received in evidence.||

*|| Bull. N. P. 248, 249. 3 B. & P. 188. 1 Esp. Cases, 427.*

*\*\* Bell v. Chapman, 10 Johns. Rep. 183.*

2. Alienage may be pleaded in bar or abatement.** If it may be pleaded in bar, it may be given in evidence under the

general issue. And in ejectment, by the *consent rule*, the defendant is bound to plead the general issue, and can put in no other plea. Under a plea of *non assumpsit*, the defendant may give in evidence that the plaintiff is an *alien enemy*.* All matters which go *in bar* of the plaintiff's action may be given in evidence under the general issue. In ejectment no special pleas can be pleaded, unless in abatement, of a matter which has arisen subsequent to the issue.

By the act of the 2d of *April*, 1798, no greater right in lands was granted to aliens than they possessed, or might possess, by the municipal law, or law of nations. Now, it is well settled that the rights of an *alien* enemy to personal property, though not taken away, are suspended during the war.† He cannot sue or bring any action to recover his property, until peace is restored. In *England*, it is held that an underwriter on *French* property, in time of peace, is not liable for a loss occasioned by capture by *British* ships, during hostilities commenced between *France* and *Great Britain*, subsequent to the policy being effected, and terminated before bringing the suit.‡

An alien enemy, even in regard to personal property, can acquire no right during the war.§

*Van Vechten*, in reply, said that without the act of *April*, 1798, aliens could not hold lands, and it was competent to the legislature to grant the right to them. The lands held by aliens are subject to taxation, and to contribute to the expenses of maintaining the war. The lessors, in the present case, hold under an express legislative grant. The rights of aliens, in regard to personal property, rest on principles of general law. The lessors, having a perfect legal title, must, on the faith of the state, have a right to protect that title from the invasion of third persons.

SPENCER, J. delivered the opinion of the court. It appears, by the case, that the title to recover exists in those of the lessors who were alien enemies at the commencement of this suit, resident within the kingdom of *Great Britain;* and the questions submitted to us are, whether, under the circumstances of this case, such alienage is a bar to the suit; and whether the objection can be taken under the general issue.

NEW YORK, October, 1814.

JACKSON v. DECKER.

* Chitty on Pl. 479. Doug. 649. n. 407. 410.

† Clark v. Morey, 10 Johns. Rep. 69.

‡ Kellner v. Mesurier, 4 East's Rep. 396. 4 East's Rep. 407.
§ Doug. 649. n. 132. Le Bret v. Papillon, 4 East's Rep. 502. Furtado v. Rogers, 3 B. & P. 191.

The plaintiffs' counsel have urged that the act of the legislature, (sess. 21. c. 72.) and the 9th article of the treaty of amity, commerce, and navigation, concluded the 19th of *November*, 1794, between *Great Britain* and the *United States*, preclude the defendant from setting up the alienage of the lessors, as a bar to their recovery. The act of *April*, 1798, declares valid conveyances thereafter to be made to any alien not being the subject of some power which, at the time of the conveyance, is at war with the *United States of America*, for the purpose of vesting the estate, thereby granted, in such alien; and it provides that it shall be lawful to and for such alien or aliens to have and to hold the same to his, her, or their heirs or assigns for ever, any plea of alienism to the contrary notwithstanding. The treaty provides that *British* subjects, who then held lands in the territories of the *United States*, should continue to hold them according to the nature and tenure of their respective estates and titles therein, and might grant, sell, or devise the same to whom they pleased, in like manner as if they were natives; and that neither they, nor their heirs or assigns, should, so far as might respect the said lands, and the legal remedies incident thereto, be regarded as aliens.

The treaty, manifestly, has no application. Sir *William Pulteney* and the lessors of the plaintiff, though *British* subjects, neither held nor owned the lot in question, until long after the treaty; and it relates only to lands *then held* by *British* subjects, and not to any after acquired lands.

The statute has reference merely to the title; it neither professes to regulate, nor does it at all relate to any remedy for the recovery of land purchased and held under its provisions. The plea of alienage, interposed to suspend a recovery during a war between the two governments, is very different from the plea of alienage which the statute meant to guard against and obviate. Without the protection of the statute, the lands purchased by Sir *William Pulteney* would have been liable to *escheat*. To do away any plea of *alienage*, working a forfeiture and devesting the estate, was the sole object of the statute. It neither contemplated nor provided for the present case, which is a mere temporary suspension of the remedy.

*Vattel*, in speaking of lands or immovable goods, possessed by the subjects of an enemy, (book 3. c. 5. s. 76.) observes, " In

permitting them to purchase and possess these goods, he has, in this respect admitted them into the number of his subjects, but the income may be sequestered, for hindering the remittance of it to the enemy's country;" evidently alluding to an alien ene= my commorant in the country.

The laws of all commercial nations allow debts to be con= tracted in time of peace, between aliens and its subjects or citi= zens; and yet, when war intervenes, it forbids an alien enemy, commorant in the enemy's country, from maintaining a suit for the recovery of such debts, pending the war. As well might the alien enemy, residing in the territory of his sovereign, com= plain that as he was suffered to acquire a debt in time of peace, he ought not to be hindered in time of war from collecting it. Such complaint would be in strict analogy with that of the plain= tiffs' in the present case. The answer in both would be the same: " Your debt, contracted with the permission of the government, is saved to you, and your lands, purchased under the sanctity of our laws, is saved to you; but neither of you can sue whilst you remain commorant in the enemy's country. The safety of the state requires that you should not get possession of your funds, during the war, lest they afford you the means of making re= mittances to the enemy's country."

The general issue of not guilty in ejectment, puts *in issue* the right of the lessors to make a demise for the purpose of maintaining an ejectment. If alien enemies, resident in the country of the enemy, cannot maintain the action during hos= tilities, as it is clear they cannot, they are incapable of ma= king a valid demise for that purpose. The case of *Bell* v. *Chapman* (10 *Johns.* 183.) shows, that the alienage of the plaintiff may be pleaded in bar, or abatement; and whatever may be pleaded in bar, may, in ejectment, be given in evidence under the general issue, provided the matter existed at the commencement of the suit. *Sellon*, (vol. 2. p. 110. c. 2.) speaking of the defence in ejectment, says, that pleas in bar, or abatement, are now seldom pleaded; for the defendant is bound, by the consent rule, to plead not guilty.

It is rendered unnecessary to notice the other points in the case. With respect to them, I will only say, that they do not stand at all in the way of the plaintiff's recovery. The title of the lessors was already made out, and the evidence offered was properly rejected.

                    Judgment for the defendant.