F. B. HEIRN, Exor. &c., *v.* E. BRIDAULT and WIFE.

1. SLAVERY: AFRICANS NOT CITIZENS OF THE UNITED STATES.—Negroes of African descent, by the common consent of civilized nations, at the time of the Declaration of Independence, and the adoption of the Constitution of the United States, were doomed to slavery, as an inferior class; possessing no rights which the white race were bound to recognize; and they were not regarded as a part of the people who united in the Declaration or in framing the Constitution; and they are not embraced in the general words of either; and are not citizens of the United States.   *Scott v. Sandford,* 19 How. (U. S.) 393.
2. INTERNATIONAL LAW: WHAT IT IS.—The law of nations is a system of rules, which reason, morality, and custom has established among *civilized* nations, as their public law.   See 1 Kent Com. 1; 1 Bl. Com. 43.
3. SAME: FORCE OF.—There is no universal immutable law of nations binding

VOL. VIII.—14

Heirn *v.* Bridault and wife.

upon the whole human race, civilized and barbarous; its obligation depends on the persuasion, that other nations will reciprocally observe the same rules on their part, in their intercourse with us, as we observe towards them; and hence, when there is an incapacity, from want of enlightenment and civilization, on the part of a particular nation, to observe the rules of the law of nations, it imposes no obligation on us with respect to them.

4. SAME: SAME.—The law of nations, like the municipal law of a particular nation, has no extra-territorial force; and as the former is limited in its operations to the territory of the nation in which it is established, and whose citizens have agreed to be governed by it, so the latter, having its origin in the necessities growing out of the commercial, diplomatic, and social intercourse of civilized nations, and being founded on their voluntary assent, either express or implied, cannot be extended to those nations who have not thus assented to it, and are from their nature and constitution incapable of civilized intercourse.

5. SAME: ALIENS, RIGHT OF.—It is only by virtue of the municipal law of each State or nation, or the law of civilized nations, which is regarded as a part of the municipal law of each, that aliens have any right beyond the jurisdiction of their native domicil.

6. SAME: ALIEN ENEMIES.—All aliens who are not friends are enemies. Alien enemies are either, 1st, temporary, or such as may become friends again; or 2d, specially permitted, or commorant in the enemy's country at the time of the suspension of amity; or 3d, perpetual enemies, or all savage and barbarian tribes who have no social, commercial, or diplomatic relations with other nations, and who do not recognize the obligations of international law and comity.

7. SAME: RIGHTS OF ALIEN ENEMIES.—Alien enemies (except such as are specially permitted) are incapable of acquiring any right to property or maintaining any action in this State.

8. SAME: ALIEN FREE NEGROES: STATUS OF.—Alien free negroes and mulattoes are expressly prohibited by statute from coming into this State; and if, in violation of the law, they do come into the State, they are required to leave on ten days' notice, and upon their neglect or refusal so to do, they may be captured and sold into slavery.. It is, therefore, the policy of this State to interdict all intercourse, commerce, and comity with this race; and to enforce against them the strictest rule of the ancient law applicable to alien enemies, except as to life and limb.

9. SAME: SAME: CANNOT TAKE PROPERTY HERE.—Alien free negroes and mulattoes, being without the protection of the Federal Constitution, as citizens of the United States, and being of a barbarian race, with whom civilized nations have no commercial, social, or diplomatic intercourse, and hence regarded as perpetual enemies (though no war be waged against them), are incapable of taking or holding any species of property in this State; and a devise or legacy to a person of that class is absolutely void.

10. SLAVES: MEANING OF "FREE PERSON OF COLOR."—The term "free person of color" means one of African descent.

APPEAL from the Court of Probates of Harrison county : Hon. George Holly, judge.

The appellees, E. Bridault and Angelique, his wife, filed their petition in the court below against the appellant, as executor of the will of Francis Hall, deceased, seeking to set aside the will of said Hall, and to recover the property thereby devised for Mrs. Bridault as his heir at law.

The petition states that Mrs. Bridault is the only child and heir of said Hall, who married her mother, Angelique, in the city of New York many years ago, and lived with her up to the time of her death, which took place on the 15th of August, 1830, in the city of New Orleans ; and that she is the issue of said marriage. That, at the time of her mother's death, Mrs. Bridault was at school in a convent, and remained there until the completion of her education. That after that time she never resided with her father, on account of the practices and frauds of one Marcelette Marceau, widow Chatteau, a free woman of color, with whom said Hall had taken up, and who induced him, in his declining years, to believe that she (Mrs. B.) was dead. That after she left the convent, it was deemed advisable by her friends that she should not return to her father's home, on account of his connection with said Marcelette Marceau, widow Chatteau.

That on the 17th of December, A.D., 1854, said Hall made and published his last will and testament, by which he gave all of his estate, consisting of three or four slaves and some other chattels, to said Marcelette, and appointed the appellant his executor. That this will was afterwards admitted to probate in the Court of Probates of Harrison county, in this State.

The petition alleges that said will and bequests are void, because said Marcelette was a free woman of color and a citizen of Louisiana, who emigrated to this State or was brought here by said Hall, contrary to the statutes of the State, and against the policy of the law; and further, because of the fraudulent practices of said Marcelette, and the belief produced by her on the mind of said Hall, that petitioner, Mrs. Bridault, was dead.

The executor demurred to the petition, and his demurrer was overruled.

He then averred, denying that Mrs. Bridault was the child and heir of Hall, or that his wife, Angelique, was her mother; and denying that said Hall and said Angelique were married in New York; but alleging that they were married in Paris, several years before they came to the United States. The averrer further denies that they ever had issue, and alleges that Mrs. Bridault was an orphan child, taken up by Hall and wife in New York, and brought by them to New Orleans when they removed thither; that shortly after the death of Mrs. Hall she left Hall's house without his consent, and has never since been with him; that although Hall always treated her well while she lived with him, yet he never acknowledged her as his daughter. Respondent does not know whether Marcelette Marceau is a free woman of color or not, but he admits she was heretofore an inhabitant of Louisiana, and came to this State with Hall. The averrer denies that said Marcelette came or was brought into this State in violation of its laws or contrary to its policy; and insists that even if she be shown to be a colored woman, she is nevertheless entitled to hold property here; as such holding does not violate any law or policy of the State.

Respondent does not know in what manner Hall and said Marcelette lived together, and of the undue influences and fraudulent practices of said Marcelette, and calls for proof.

On the trial, the deposition of Jacques Combe, a witness for petitioner, was read. The witness stated that he had known Mrs. Bridault and Francis Hall since 1832; and he knew Mrs. Hall from the same date until her death. In 1832, they lived in La Fayette, now the Fourth District of New Orleans. Mrs. Bridault was the daughter of Hall and wife, and was seven or eight years old at the death of her mother (in 183–). She lived with them at La Fayette. Witness never heard of any other child of Hall and wife. Witness was intimate with Hall and his family, and frequently visited them on his first acquaintance. Mrs. Bridault was then at school in the First District of New Orleans. Hall came every Sunday and Thursday to bring her clothes. Mrs. Bridault is very like Francis Hall; there is a strong family resemblance between them. Hall seemed to love her very much until after the death of her mother, when he seemed to neglect her. Hall spoke to witness of Mrs. Bridault as his child, and witness saw him present her to

others as such. Hall and wife both recognized her as their child; and she was generally acknowledged as such. Witness never heard it surmised that she was of Irish extraction, and does not believe she is. Never heard that she was an adopted child of Hall and wife.

Witness first knew Marcelette Marceau, widow Chatteau, two or three months after Mrs. Hall's death. He saw her first at Hall's. She was a bright mulatto, and witness understood her to be a free woman of color; her son is still darker; her hair is kinky. She acts as mistress of Hall's house, and had great influence over him. She wanted witness to call her Mrs. Hall, which he refused to do, and this made her very mad. A few months before Hall's death, witness went to see him; he was sick in bed, and witness began asking him about his daughter, when he made witness a sign not to speak before Mrs. Chatteau, who was present. Hall had sent word to witness that he wished to speak with him on some subject. Witness went to Hall's twice in pursuance of this message; but Mrs. Chatteau did not leave him, and Hall did not tell witness what he wanted.

The witness also stated his own residence to be New Orleans; and gave an account of several removals made by Hall to different parts of the city, in which account he was sustained by the other witness for the petitioner.

Mrs. Clementine Martin, in her deposition, stated that she first knew Mrs. Bridault in 1846, when her father, Francis Hall, introduced her to witness at a wedding; he danced with her at the wedding, and said to witness, " Does she not look just like me? Has she not just my chin?" Witness first knew Hall in 1838, in La Fayette. Never knew his wife. Hall told witness, in 1838, that his daughter was in a convent, where she had been sent, because Mrs. Chatteau ill-treated her. Hall told witness, over and over again, that Mrs. Bridault was his daughter, and presented her to others as such; she was so considered by everybody. He told witness that he was married in France.

In 1853, witness staid two weeks at Hall's house in Pass Christian. He only spoke of his daughter when Mrs. Chatteau was absent; when she was away he would drink to his daughter's health. He showed witness her portrait, and also the portrait of

her mother.    Witness knew Hall intimately, and there is a strong family likeness between him and Mrs. Bridault.

Witness first knew Widow Chatteau in 1838, in Lafayette; she was regarded as a free woman of color, and so treated in New Orleans; she is a mulatto, rather dark than light, and her hair is kinky; witness never saw a white person of her color; witness does not know when she commenced living with Hall: she had great influence over him, and he was very much in dread of her. Mrs. Chatteau did all in her power to alienate Hall from his daughter; always spoke ill of her, and, on one occasion, witness heard her say that Mrs. Bridault was dead.    Hall told witness that he was obliged to pass Mrs. Chatteau off as a white woman, in order that she might be allowed to stay at Pass Christian; Mrs. Bridault is about thirty years of age.    Hall and his wife were both French. Mrs. Bridault is not of Irish descent, but witness has heard Mrs. Chatteau say she was; witness heard her make this statement twice in the presence of Hall, who got mad, and replied that his daughter had no more Irish blood than he had.

Felix M. Jacobs's deposition states, That he is now about thirty-five years of age (March, 1858), and has known Mrs. Mary Angelique Bridault ever since he was seven years of age; her father and mother had just arrived in New Orleans, and rented a house from witness's father, adjoining the one in which he lived: she was then very small—five or six years old; has known Francis Hall from that time (1831) until his death.    Witness knew Mrs. Hall; she and Hall were considered as husband and wife.    Mr. and Mrs. Hall always spoke of Mrs. Bridault as their only child.    When they lived in Lafayette, the child was put to school at witness's father's house; Hall came to see her every Sunday, and sometimes carried her home with him.    She afterwards lived at Lafayette for a while, and was then sent back to school.    After witness grew up, he did not visit Hall's house, but frequently met him, and often asked him how his daughter was, and he would reply, "She is well," &c. Hall seemed to be very fond of her, and she resembled him in appearance.    She is not of Irish extraction, that witness ever heard of.    He never heard Mr. and Mrs. Hall speak of her as an adopted child.    Witness knows Mrs. Chatteau; first saw her at Hall's; she lived with him as his mistress; she is a mulatto, and so regarded in

New Orleans; her sons are much darker than she is; never noticed her hair, as she always wore a handkerchief over her head.

Mrs. Louise Voez's deposition states, That she has known Mrs. Bridault since 1846; witness was at a wedding when Mr. Hall introduced her; he said: "Here is my daughter and son-in-law that I present to you." Mrs. B. was then married to her first husband, Morehead. Witness first met Hall, in 1838, at the house of a mutual friend, who introduced witness to Mr. Hall as a Parisian. Hall asked witness from what quarter of Paris she had come, and said that witness must know his wife, Angelique Mallet; witness told him that she had known her very well in Paris, and had done work for her. He then said she was dead, and that he had one daughter by her, who was in town. Afterwards knew Mr. Hall very well; he frequently came to witness's house, and was quite intimate with her husband; he never came there without speaking of his daughter: he seemed very fond of her; there was a strong family likeness between him and Mrs. Bridault: he spoke of this likeness, and seemed proud of it. Witness once told Hall that she thought Mrs. Bridault was like her mother, Angelique Mallet; he said that she was. About three months before Hall's death, he came to witness's residence, and said he was very sick, and would not live long; he then requested witness to tell Jacques Combe to come and see him, that he had something to tell him; he then asked witness if she had seen his daughter Angelique lately, and said he wanted very much to see her, and that he was very sick. Mrs. Bridault is certainly not of Irish descent, and this is the first time witness ever heard it suggested that she was; witness never heard that she was an adopted child of Hall, and never heard Hall say anything in reference to her paternity, but that she was his own daughter.

Witness knows Mrs. Chatteau; she is a light mulatto, and is so considered in New Orleans; her negro blood is very apparent; witness never saw her hair, as she always wore a handkerchief on her head. On one occasion, when Hall was at witness's house, he said: "How disagreeable it is; they will not let the woman (referring to Mrs. Chatteau) stay at Pass Christian; I will have to get some people to pass her off as a white woman and marry her, in order that she may remain there." Mrs. Chatteau had a great deal of

influence over Hall, and, from the manner in which he spoke of her, he was evidently very much in dread of her.

Auguste Loez's deposition states, That he knew Mrs. Bridault from February, 1846, till the present time. Hall introduced him to her as his daughter; he always spoke of her as his daughter. Four or five years ago witness went to Pass Christian and saw Hall there; he asked witness how his daughter was. Witness knew Hall intimately. Mrs. B. "is his exact image. One who knew the father and not the daughter, could not make a mistake. She has exactly his expression, and the likeness between them is striking. Hall was very fond of her." She was recognized by Hall and all her acquaintances, as Hall's daughter. Never heard that Mrs. B. was of Irish descent, or that she was an adopted child of Hall's. This witness also proves Mrs. Chatteau to be a mulatto.

The petitioner, Mrs. Bridault, was examined as a witness in her own behalf. She stated that she never heard herself reported by her father and mother (F. Hall and wife) otherwise than as their child; she had been informed by them that she was their child; that Hall was a Frenchman, and left Paris to come to New York, in 1827 or 1828, leaving his wife until he could send for her. Mrs. Hall came over three or four months afterwards; and petitioner was born during the passage, as she has frequently been told by her mother. They moved to New Orleans about 1830 or 1831, and she always lived with them until the death of her mother, in 1835 or 1836. After her mother's death, Mrs. Chatteau came to live with her father; she maltreated petitioner very much; and petitioner now has the marks of injuries inflicted by her. After her mother's death her father sent her to school in a convent in New Orleans, and afterwards boarded her at Mr. Jacobs's, and sent her to school. She left her father in 1838 or 1839 on account of the treatment she received from Mrs. Chatteau and the advice of her friends, who thought it not prudent for her to live with her father. In 1840 she went to Philadelphia with Mr. Morehead's family, and whilst there married Mr. Morehead, by whom she has four children. Her first husband died in 1848, and in 1853 she married E. Bridault. Her father (Hall) always treated her kindly, and was very fond of her; and after her marriage introduced her to his acquaintances, and said, "She is my picture; she has my very

Heirn *v.* Bridault and wife.

chin; no child resembled her father more." After she was mar-
ried and had children, she did not visit her father, because he lived
with Mrs. Chatteau, a free colored woman, as his mistress, but he
continued to visit her. Mrs. Chatteau had much influence with her
father, and got him to leave the city of New Orleans. Her father
could not speak of her in presence of this woman.

Cross-examined. She remembers her mother well; she appeared
to be about thirty years old when she died; she did not know when
her father and mother were married; she knew Mr. and Mrs. Mal-
lard, witnesses for defence; she went to see them once to ascertain
what they knew about her birth, as she had consulted Mr. St. Paul
about suing for the succession of her mother; they then informed
her that they could not swear that she was the child of Mr. and
Mrs. Hall. They had always heard that she was an orphan, whom
they had taken to raise, but they knew nothing of the matter them-
selves.

The certificate of the marriage of Hall and wife was produced,
which showed that they were married in Paris on 23d August, 1816.

The defendant read the deposition of the following witnesses, viz.:

1. Ferdinand Mallard. First knew Hall and wife in New York,
in 1826; they were French, and arrived in New York in 1825, to
the best of his belief. Witness has heard his eldest brother, grand-
mother, and father say that Hall and wife had no children when
they arrived; and he always understood that Mrs. Hall had no
children. Witness knew them two or three years in New York;
he was too young to be intimate with them, but he occasionally
called at their residence. Witness's family was well acquainted
with the Halls, and such intimacy existed between them as would
arise between neighbors speaking the same tongue and being of
the same nation. Witness came to New Orleans in 1829, and
Hall and wife removed there about the same time. In 1828 or
1829 Hall boarded at witness's father's house during the winter;
his wife, who resided in Harlem, came frequently to see him, and
Hall went to see her at the end of every week.

Hall and wife had a little girl living with them in New York,
called Angelique. I first saw her about the year 1826; she was
then about three or four years old. About that time it was stated
in witness's family, that the little girl had been recently taken in by

Hall and wife, and that her mother was a poor Irish woman who died in a hospital. Witness heard his parents, in speaking of the matter, praise the charity of Hall and wife. Witness never heard Hall or his wife speak of these matters, but he heard his parents and family speak of it, and say that they had heard it from Hall and wife. Witness was too young to know what the general repute was about the parentage of Angelique in New York; and after they removed to New Orleans, he was not sufficiently in contact with their acquaintances to know how they regarded the matter; but he thinks if Mrs. Hall had borne a child, that he would have heard it.

Witness's family in New York was composed of his father, mother, grandmother, three sisters, and two brothers. All of them are dead except his three sisters and one of his brothers, and they reside in New Orleans. Hall was intelligent and honest, and witness thinks him incapable of so base an action as denying his child.

Some years ago Hall told witness that the orphan girl whom he and his wife had raised was going to prosecute him for his wife's succession, pretending that she was the daughter of himself and wife, and he said he would call on witness to prove that she was an orphan, whom he and his wife had raised out of charity.

On cross-examination he stated that when Mrs. Hall called with the little girl to see Hall, when he was boarding at witness's father's, as before stated, that he has heard him salute them by saying, "*Comment est la mère? Comment est la fille?*" How is the mother? How is the child or daughter?

2. Louisa Mallard is a sister of the last witness, and is younger than he is; recollects very little of what occurred in New York, but gives the same account of the statements made by her family as he does. She further stated that her brother Louis, now dead, told her that Angelique Hall called on him to know whether he had not known her as the legitimate child of Francis Hall, and that he told her that she was not their child, but an orphan. The witness further stated that Mrs. Bridault called on her some time ago, and told her she was Angelique Hall; she does not know whether she is Angelique Hall or not, but if so her features had so much changed that she did not recognize her; she finds no resemblance between Mrs. Bridault and Hall.

3. P. Guerard states that he is a clergyman of the Catholic Church and parish priest of St. Bartholomew's Church, Algiers; was well acquainted with Hall, and boarded at his house two years; he spoke to witness very seldom of his family affairs, but told him he had been married to a French woman, who was dead, and that he never had any children by her. He spoke to witness once or twice of the petitioner, Mrs. Bridault, in very harsh terms. Witness was sitting one day in the large house at Pass Christian, in the summer of 1852, and perceived there a little oil painting of a lady. Witness asked whose portrait it was, and Hall replied that it was the likeness of a scamp of an Irish orphan girl; that he was keeping a store in Barclay Street, New York, when he adopted her; that he had provided her with a fine education, and had been treated by her with monstrous ingratitude; that she ran away with an American gentleman, and lived with him unlawfully; he hinted also that this lady was leading a very irregular life. Witness remonstrated with him, finding that he was using very intemperate language. He swore he was a fool to have attached himself to such a woman, and " prayed me if I valued his friendship, never to speak to him again on these painful matters." Hall told witness he had been married to Madame Chatteau by Father Moise of the St. Louis Cathedral, New Orleans.

4. John Brill testified that Hall came to Pass Christian to reside, seven or eight years ago, and resided with Mrs. Chatteau, in the house next to witness's. He was present when Hall's will was executed. The will was drawn up by Mr. Champlin. Witness told Champlin that he had heard that Hall had a daughter, and suggested that he should ask him if such was the fact. Champlin did ask him if he had any children, and Hall answered him that he had none, and never had any. Hall had been sick for a long time previous to the making of his will with a disease of the throat, and Hall told witness that his disease was mortal, and that he did not expect to live long.

Cross-examined. He stated that Mrs. Bridault, who was present in court, did not look like a person of Irish descent, but he guessed she was of French extraction, and that the " distinctive features between the Irish and French were very marked and well defined."

5. Finley B. Heirn, the executor, stated the same in substance as the last witness.

William A. Champlin in substance testified to the same; and in addition stated that the will was executed in the west room of the house in which Hall lived; that Madam Chatteau was not present on that occasion, and witness did not see her, but heard her voice in another room of the house, or in the kitchen; that he is acquainted with both the Irish, and the French creoles of Louisiana, and has been for many years; that Mrs. Bridault does not look like she was of Irish descent, but, on the other hand, looks like a creole of Louisiana, or a descendant from the French.

Brill, Heirn, and Champlin, all stated that "Mrs. Hall had a family resemblance of Hall which was rather remarkable."

The will in controversy is on the record, and is dated 17th of December, A. D. 1854. It gives all of the testator's property to Marcelette Marceau, widow Chatteau, and describes her as " of the town of Pass Christian, county of Harrison, State of Mississippi."

By agreement of the parties, the cause was submitted to the judge of the Court of Probates, whose decree was to have the same effect as the verdict of a jury. The judge rendered a decree in favor of the petitioners on all the points made by the petitioners, and the executor appealed.

*W. P. Harris*, for appellant,

Cited, *Shaw* v. *Brown*, 35 Miss. 246; *Duke of Richmond* v. *Milne*, 17 La. R. 312; *Leiper* v. *Hoffman*, 26 Miss. R. 615; *Hinds* v. *Brazealle*, 2 How. 836; St. Cyr's Case, 21 Ala. 454; Cobb on Slavery, 313–14–15; 3 Dev. & Batt. 25; 4 Dev. 340; *Legrand* v. *Darnall*, 2 Peters R. 666; 10 Grattan, 485.

*Anderson* and *Yerger*, for appellees,

Cited *Scott* v. *Sandford*, 19 How. (S. C. R.) 393; *Thornton* v. *Demoss*, 5 S. & M. 609; *Johnson* v. *Brown*, 1 Spear R. 268; 1 Richardson R. 318; *Fable* v. *Brown*, 2 Hill Ch. R. 390; *Calvin's Case*, 4 Coke's R. 33; 3 Wash C. C. R. 484; 1 John. Ch. R. 206; 13 J. R. 1; 10 Ib. 69; Ib. 183; Wheaton's Law of Nations, 349 *et seq.*; Vattel, 332; 9 Georgia R. 564; *Hall* v. *The State*, 2 Hawke R. 582; 14 Georgia R. 198; 20 Ib. 510.

Heirn *v.* Bridault and wife.

HARRIS, J., delivered the opinion of the court.

The appellees filed their petition in the Probate Court, in behalf of Mrs. Bridault, claiming to be the heir at law of Francis Hall, deceased; alleging that appellant, as executor of said Hall, had possessed himself of certain personal estate belonging to said decedent, by virtue of a pretended will in favor of one Marcelette Marceau, widow Chatteau, a free woman of color, whom the testator brought from the State of Louisiana, of which State she was a citizen, to reside with him in this State, in fraud of the laws and policy thereof. The petitioner prays that the will in favor of said free woman of color may be set aside, and the petitioner declared entitled to the estate as the sole heir and distributee of the said decedent. To this petition, there was a demurrer, which was overruled. The appellant answered the petition, denying the several allegations thereof. Proofs were taken and submitted to the judge of probates on final hearing, whose judgment was, by agreement appearing on the record, to have the effect of the verdict of a jury. A decree was thereupon entered in favor of the appellees, on all the points made by the petition: from which decree this appeal is prosecuted.

It will only be necessary to notice two points presented in this record.

1st. Does the proof show that the appellee is the child and heir of the decedent? and 2d. Is a "free woman of color" capable of taking property by devise in this State?

Regarding the judgment and decree of the court below as the verdict of a jury, upon the issues of fact involved in this inquiry, under the agreement appearing in the record, we see nothing to justify the court in disturbing that verdict, on the first point presented. Viewing the testimony in the most favorable light for appellant, it can only be regarded as presenting a case of conflicting testimony, in which the preponderance of evidence cannot be said to be greatly in favor of appellant. We are, therefore, to regard it as settled, that petitioner is the child and heir at law of Francis Hall, and entitled to his estate, unless he has made a valid disposition of that estate in his lifetime, by deed, or will, or other conveyance.

That the legatee under the will, purporting to dispose of his whole estate, was a "free woman of color," we think beyond doubt,

from the evidence in the record.   And that, by the description of "free woman of color," is to be understood one of African descent, we think equally clear, from the frequent use of the same or similar language, by both the legislative and judicial departments of our State and National Governments, as synonymous with "free negro."

The only remaining question for our consideration, therefore, is, whether a "free negro" from another State, *without any legislative intervention in his behalf* here, *or without permission* by our laws, is capable of taking property by will in this State.

What, then, is the *status* of the African race in the State of Mississippi ?

In the absence of positive law *here*, securing to them rights, neither the citizens nor inhabitants of other states or nations have any rights in the State of Mississippi, except those resulting from comity.

It is especially true of the African, according to the case of *Scott* v. *Sandford*, 19 How. (U. S.) 393; that he has no rights, but such as those who hold the government and the power choose to give him. "In the opinion of the court," says Ch. J. Taney, on p. 407, "the legislation and histories of the times, and the language used in the Declaration of Independence, show that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument.   .   .   .   They had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; *and so far inferior that they had no rights which the white man was bound to respect;* and that the negro might justly and lawfully be reduced to slavery for his benefit.   He was bought and sold, and treated as an ordinary article of merchandise and traffic, whenever a profit could be made by it.   This opinion was, at that time, *fixed and universal* in the *civilized* portion of the white race.   It was regarded as an axiom, in morals as well as in politics, which no one thought of disputing, or supposed to be open to dispute : and men in every grade and position in society daily and habitually acted upon it, in their private pursuits as well as in

matters of public concern, without doubting, for a moment, the correctness of this opinion.

"And in no nation was this opinion more firmly fixed or uniformly acted upon than by the English Government and the English people. They not only seized them on the coast of Africa and sold them, or held them in slavery for their own use, but they took them as ordinary articles of merchandise to every country where they could make a profit on them; and were far more extensively engaged in this commerce than any nation in the world.

"The opinion thus entertained and acted upon in England was naturally impressed upon the colonies they founded on this side of the Atlantic. And, accordingly, a negro of the African race was regarded by them as an article of property, and held, and bought, and sold as such, in every one of the thirteen Colonies which united in the Declaration of Independence, and afterwards formed the Constitution of the United States."

After citing various colonial acts of legislation in proof of these facts, Chief Justice Taney next proceeds to show that the Declaration of Independence neither referred to nor embraced this inferior race. . . . . "But it is too clear (says he) for dispute, that the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this Declaration. For, if the language as understood in that day would embrace them, the conduct of the distinguished men who framed the Declaration of Independence would have been utterly and flagrantly inconsistent with the principles they asserted; and instead of the sympathy of mankind, to which they so confidently appealed, they would have deserved and received universal rebuke and reprobation.

"But the men who framed this Declaration were great men; high in literary acquirements, high in their sense of honor, and incapable of asserting principles inconsistent with those on which they were acting. They perfectly understood the meaning of the language they used, and how it would be understood by others; and they knew that it would not, in any part of the civilized world, be supposed to embrace the negro race, which, by common consent, had been excluded from civilized governments and the family of nations, and doomed to slavery. They spoke and acted according

to the then established doctrines and principles and in the ordinary language of the day, and no one misunderstood them. The unhappy black race were separated from the white by indelible marks and laws long before established, and were never thought of or spoken of except as property, and when the claims of the owner, or the profit of the trader, were supposed to need protection.

" This state of public opinion had undergone no change when the Constitution was adopted, as is equally evident from its provisions and language."

" No one of that race had ever migrated to the United States voluntarily. All of them had been brought here as articles of merchandise. The number that had been emancipated at that time were but few in comparison with those held in slavery; and *they* were identified in the public mind with the race to which they belonged; and regarded as a part of the slave population rather than the free. It is obvious that they were not even in the minds of the framers of the Constitution, when they were conferring special rights and privileges upon the citizens of a State, in every other part of the Union."

He next proceeds to show that after the adoption of the Constitution of the United States, the different States still regarded the African as an inferior race, and not as citizens. He shows that Connecticut, in 1833, passed a law making it penal to set up any school in that State for the instruction of persons of the African race, not inhabitants of the State, &c. That in the case of *Crandall* v. *The State*, 10 Conn. R. 340, Chief Justice Dagget held, that persons of this description were not citizens of a State, within the meaning of the word " citizen" in the Constitution of the United States; and were not, therefore, entitled to the privileges and immunities of citizens in other States.

We forbear to quote further from this able, learned, and lucid opinion of the eminent Chief Justice, although *pages* might be cited further illustrative of the fact that the negro or African race have no *status*, civil or political, in this country, save such as each State may choose to confer by special legislation in its own jurisdiction.

The *reason* for this is because this race are *alien strangers*, of an inferior class, incapable of comity, with whom our goverment has

no commercial, social, or diplomatic intercourse.  An examination of the doctrines announced in " *Calvin's case*," will serve to illustrate this position and further explain its reason.

" *Calvin's case*" was this : " Whether Robert Calvin (being born in Scotland, since the crown of England descended to his Majesty) be an alien born, and consequently disabled to bring any real or personal action for any lands, within the realm of England."

And it was adjudged, in the Exchequer Chamber (the lord chancellor and the twelve judges concurring), that Calvin was not an alien born, and consequently might maintain his suit.   4 Coke's R. 33.

The report of the case, however, proceeds upon the admission that an " alien born" can maintain no action, real or personal, for any lands within the realm of England.   And it is worthy of consideration, as exhibiting the state of the English law, at this early period, in relation to the rights of aliens there.   " Every man," it is there said, " is either an alien born or a subject born.   Every alien is either a friend that is in league, &c., or an enemy that is in open war, &c.   Every alien enemy is either temporary, or perpetual, or permitted especially.   Every subject is either born, or given, or made."

" An alien friend, as at this time, a German, a Frenchman, a Spaniard, &c. (all the kings and princes in Christendom being now in league with our sovereign : but a Scot, being a subject, cannot be said to be a friend, nor Scotland to be *solum amici*), may, by the common law, have, acquire, and get, within this realm, by gift, trade, or other lawful means, any treasure, or goods personal whatsoever, as well as an Englishman, and may maintain any action for the same ; but lands within this realm, or houses (but for their necessary habitation only), alien friends cannot acquire, or get : or maintain any action, real or personal, for any land or house, unless the house be for their necessary habitation.   For if they should be disabled to acquire and maintain these things, it were in effect to deny them trade and traffic, which is the life of every island.   But if this alien become an enemy (as all alien friends may), then is he utterly disabled to maintain any action, or get anything within this realm.   And this is to be understood of a temporary alien, that, being an enemy, may be a friend ; or, being a friend, may be an

enemy.   But a perpetual enemy (though there be no wars, by fire and sword, between them), cannot maintain any action, or get anything within this realm." And this is to be understood, I take it, of all savage and barbarian tribes, who have no diplomatic, commercial, or social relations, with other nations, and who do not recognize the obligations of international law and comity.   The author, by way of illustration, as an example, proceeds thus : "All infidels are, in law, perpetual enemies (for the law presumes not that they will be converted, that being a remote possibility), for between them, as with the Devil, whose subjects they be, and the Christians, there is perpetual hostility, and can be no peace."

It is said that the doctrines of this case have been overturned, or at least denied, and *Omychund* v. *Barker*, 1 Atkyns, 42, is cited for this.   An examination of that case will show that no such questions were there involved.   The question under discussion, by Lord Chief Baron Parker (from whose judgment this inference has been drawn), was as to the admissibility of alien infidel witnesses : " It was objected," says he, " that they ought not to be admitted as witnesses, from the perpetual enmity between heathens and Christians, upon the authority of Calvin's case, &c.   7 R. 17."   He adds : " This is to be understood of spiritual discord only.   Sir Edward Littleton, lord keeper, in his readings upon the statute of the 27th Ed. 3, has sentiments there worthy of a great Christian writer : ' Turks and infidels,' saith he, ' are not *perpetui inimici*, nor is there a particular enmity between them and us ; but this is a common error, founded upon a groundless opinion of Justice Brooke ; for, though there be a difference between our religion and theirs, that does not oblige us to be enemies to their persons : they are the creatures of God, and of the same kind as we are, and it would be a sin in us to hurt their persons.'   Salk. 46."

It will be seen that the Chief Baron is here directing his opinion to the illustration used by Lord Coke, and not to the principle he was endeavoring to enforce.

Lord Coke was discussing the question, " Whether Calvin, the plaintiff (being born in Scotland since the crown of England descended to James I), be an alien born, and so disabled to bring any real or personal action for any lands within the realm of England. After discussing, at great length, the doctrine of allegiance, and to

whom it is due, and from whom, he comes to show from whom it is not due, and why. He defines an alien to be, "a subject that is born out of the ligeance of the king, and under the ligeance of another, and can have no real or personal action for or concerning land; but, in every such action, the tenant or defendant may plead that he was born in such a country, which is not within the ligeance of the king, and demand judgment, if he shall be answered." For this, he cites Littleton, and other authorities.

He next proceeds to show the different kinds of aliens: 1. Alien friends. 2. Alien enemies. He again distinguishes the different classes of alien enemies, into, 1, alien enemies who are temporary; 2, perpetual; and, 3, specially permitted. And when he comes to treat of perpetual enemies, he says: "But perpetual enemies (though there be no wars, by fire and sword, between them) cannot maintain any action, or get anything within this realm." "All infidels are *perpetui inimici*," &c. He is treating of the political rights and relations of different nations and their subjects, and showing that among nations, between whom there is friendly commerce and intercourse, even a temporary interruption of friendly relations will not destroy the rights of subjects commorant therein, who could not foresee and anticipate such event. That, between nations acknowledging and practising the comity of commercial intercourse, to destroy the rights of property of their respective subjects, so commorant in either, on account of a temporary war or enmity, would be, "in effect, to deny unto them trade and traffic, which is the life of every island." But not so with barbarians, savages, and perpetual enemies, or nations who neither acknowledge nor practise this comity, social and commercial (though with such there be no wars with fire and sword). But they are not alien friends, and therefore fall, politically, under the other class,—alien enemies; not personal enemies, but rather alien strangers, who neither extend nor receive the civilities which belong to enlightened nations.

There is nothing inconsistent in the doctrines of Sir Edward Coke, in *Calvin's case* and the views of Lord Chief Baron Parker, in *Omychund* v. *Barker,* and Sir Edward Littleton. They rightly construed the illustration used by Lord Coke in relation to the case of infidels, in reference to the more modern doctrines of civilized nations.

Such were the views of the court in *Wells* v. *Williams*, 1 Lord Raymond, 282, where it is said "that the necessities of trade have mollified the too rigorous rules of the old law in their restraint and discouragement of aliens. A Jew may sue at this day, but heretofore he could not, for then they were looked upon as enemies; but now commerce has taught the world more humanity, and therefore held, that an alien enemy, commorant here by license of the king, and under his protection, may maintain debt upon bond, though he did not come with safe conduct."

While, therefore, as an illustration, and also in point of historical accuracy, Lord Coke rightly used the case of the infidel as an instance of *perpetui inimici*, it is equally true that commerce, intercourse, and increased intelligence have introduced into the family of nations, and subjected to their laws, most of these alien strangers or enemies, who, in Lord Coke's day, as well as under the Grecian and Roman dominion, were regarded as enemies, whether strangers or barbarians, and subject to be captured and enslaved, the moment they passed the bounds of one state and entered the confines of another. See Wheaton's Law of Nations, 1, and *Fable* v. *Brown*, 2 Hill's Ch. R. 392–3–4, and authorities cited, 1 Kent, 4–5.

So in *Ramkissenseat* v. *Barker et al.*, 1 Atkyns, 51. To a suit by an alien it was pleaded "that the plaintiff was an *alien born* and an *alien infidel*, not of the Christian faith, and upon cross bill incapable of being examined upon oath, and therefore disqualified from suing here," and Lord Hardwicke overruled the plea.

There was no allegation that the plaintiff was an alien *enemy*, or an alien stranger, having no intercourse, social, commercial, or diplomatic, with the country where the suit was brought, or that the plaintiff belonged to a barbarian or savage nation, not recognizing the laws and comity of nations, and having therefore no right to claim their benefits; in short, no allegation depriving the plaintiff of the right of suit, allowed to alien *friends* by the comity of nations. And the plea was, therefore, properly overruled. 1 Ld. Ray. 282; 2 Strange, 1082; 10 John. 69; 1 Bac. Abr. 213.

While alien *friends*, recognizing and submitting to the law of nations, are by that law entitled to prosecute personal actions, but not real, alien *enemies* can prosecute neither, unless permitted.

" The reason why an *alien friend* is allowed to maintain personal

actions is because he would otherwise be incapacitated to merchandise, which may be as much to our prejudice as his; but as to allowing him to maintain real actions, there is no reason for it, because there is no necessity that he should settle among us: an *alien enemy* is disabled, from the prejudice that may accrue to the king and kingdom, if he were allowed to maintain any action." 1 Bacon Abr., title Alien, 210 (D.), and numerous authorities cited. 1 Kent, Com. 75–80; Wheaton's International Law, 357; 3 Kent, 340; 16 John. R. 438; 2 Black. Com. 293, and notes; 3 Mod. 130; 1 Ld. Raym. 282.

So strict is this doctrine that even a British subject, resident and carrying on trade in an enemy's country, can maintain no action in England; but is subject to all the civil disabilities which attach to an alien enemy. *McConnell* v. *Hector*, 3 Bosanquet & Puller R. 113; *Le Bret* v. *Papillon*, 4 East. 502; 10 John. 184; *Jackson* v. *Decker*, 11 John. 418; *Bradwell* v. *Weeks*, 13 John. 1; *Fairfax, Lessee*, v. *Hunter*, 7 Cranch, 620.

The authorities are uniform, both in England and in this country, that during the suspension of friendly relations, all the rights and liabilities of the citizens of the respective nations are also suspended. It is further settled, that aliens *permissi*, who are commorant in the enemy's country at the time of the suspension of amity, are under the protection of such government, and subject to no disability there on account thereof.

It is further deducible, from the principles and reasoning asserted and employed, that under the appellation of alien enemies are embraced all nations, tribes, and people who are not alien friends, whether in a state of war, or barbarians, or strangers to the laws and comity of civilized nations, and therefore incapable of their appreciation or enjoyment.

It is only by virtue of the municipal law of each state or nation, or by the law of civilized nations, which is regarded as a part of the municipal law of each, that aliens have any rights at all; and neither the municipal law, nor the law of nations, has any extra territorial operation. As the municipal law is limited in its operation to the territory of the nation by which it is established, and whose citizens have agreed to be governed by its rules, and does not extend to any other nation or people who have not thus con-

Heirn *v.* Bridault and wife.

sented to its obligations; so the law of nations, having its origin in the necessities growing out of commercial, social, and diplomatic intercourse of *civilized* nations, and being founded upon the express or implied assent of such nations, cannot be extended to embrace those nations or people who neither respect nor acknowledge the laws of God or man, and are wholly incapable, from their nature and constitution, of *civilized* intercourse. " The law of nations is a system of rules, which reason, morality, and custom have established among *civilized* nations as their public law." 1 Kent, 1; 1 Black. Com. 43.

Mr. Wheaton, in his work on International Law, after examining the definition and sources of international law, as discussed by Grotius, Hobbes, Puffendorf, Rutherforth, Bynkershoek, Heffter, Vattel, Montesquieu, and others, and the character of its obligations, and upon what nations it operates, thus defines it: " International law, as understood *among ·civilized* nations, may be defined as consisting of those rules of conduct which reason deduces as consonant to justice, from the nature of the society, existing among independent nations; with such definitions and modifications as may be established by *general consent*," 'and for this he cites Mr. Madison. See International Law, 46.

" There is, then," he says in another place, " according to these writers, no universal, immutable law of nations, binding upon the *whole human race*, which mankind, in all ages and countries, ancient and modern, savage and civilized, Christian and Pagan, have recognized in theory or in practice, have professed to obey, or in fact have obeyed. . . . : The obligation of the ordinary *jus gentium depends upon the persuasion that other nations will observe the same rules in their intercourse with us, which we observe towards them;* or if they fail to observe these rules, that they will incur the *general hostility of nations. But this persuasion cannot exist, as to those races of men who do not recognize one law of nations.*" Wheaton, International Law, 40; 1 Burlamaqui, 137–8.

Having shown, as we think, that the African is neither embraced by the terms of the Federal Constitution, nor by the laws of international comity, we will next inquire how he is regarded by our municipal laws.

Under our statutes, the descendants of all female slaves, whether negro or other character or color, lawfully in this State are deemed slaves; thus adopting the rule of the civil law, *partus sequitur ventrem.* See Hutch. Code, 512, art. 2, § 1; New Code, 235, § 1, art. 1; Cobb, Law of Slavery, 68, § 70. And it has been held in this State, as well as other States of the confederacy, that "color is *prima facie* evidence of slavery." *Thornton* v. *Demoss,* 5 S. & M. 609; 1 Spear S. Carolina R. 268; 1 Richardson S. C. R. 318, 324; Cobb on the Law of Slavery, sect. 69, and note 2; citing numerous other cases.

A negro, by the laws of this State, is *prima facie* a slave. *Coon* v. *The State,* 13 S. & M. 249; *Randal* v. *The State,* 4 S. & M. 351.

Our statute further provides, "that every person other than a negro, of whose grandfather or grandmother, any one is or shall have been a negro, *although his other progenitors, except that descending from the negro, shall have been white persons,* shall be deemed a mulatto ; and so every such person, who shall have one-fourth part or more of negro blood, shall be deemed a mulatto." Hutch. Code, 514, § 15 ; New Code, 235, § 1, art. 2.

And by the 45th sect. of Hutch. Code, 519, revised and adopted into the New Code, p. 235, § 1, art. 3, "all negro and mulatto slaves, in all courts of judicature in this State, shall be held, taken, and adjudged to be personal property."

By these provisions, it was evidently designed not only to protect the white race against political association and equality with those thus declared slaves and personal property, but also with those who, though born of a *white* mother, yet their father, or mother's father, or father's mother, "shall have been a negro." But for the provision above, the children of white mothers by negroes would have belonged to the white race (following the condition of the mother), and been entitled to all the privileges of citizenship. Where, therefore, the father, grandfather, or *grandmother on the father's side,* shall have been negroes, although the mother be a free white citizen, the issue, having one-fourth negro blood, is, by this article, declared to be a mulatto, and classed with free negroes and mulattoes.

It was only the intention of the legislature so to provide, that neither slaves, free negroes, or free persons of color, nor mulattoes,

should be classed with the white race.    Under our statutes, they are divided into three classes : 1st. Slaves, or those lawfully held to service for life, and the descendants of the females of them ; 2d. Free negroes, or free persons of color, as manumitted slaves and their descendants, or African negroes who have never been subjected to slavery ; 3d. Mulattoes, as intended to be embraced in the 2d article of the 1st sect. of the Code, chap. 33, or such as are descended from *free white mothers,* but have one-fourth or more of negro blood.

Our statutes, therefore, have not changed the *status* of the African race, *born and residing amongst us,* except so far as to protect their existence, and to secure their comfort, consistently with their *property condition.*    Their descendants in the maternal line are *prima facie* slaves, the property of some one, no matter what their color or approximation to the white race, physically or mentally. But alien free negroes or mulattoes, by the 80th art. § 12, of the New Code, readopting the old law, are expressly prohibited from coming into this State ; and on ten days' notice, are required to leave the State, and for non-compliance, they may be caught or captured, by warrant, and by order of the board of county police may be sold into slavery for life.

It is, therefore, the policy of this State to interdict all intercourse, commerce, and comity with this race ; and by law, expressly provided, we enforce the strictest doctrines of the ancient law, as applicable to *alien enemies,* except as to life or limb, against them.    We enslave them for life, if they dare set their foot on our soil, and omit to leave on notice in ten days.    And this not upon the principle, supposed by some, of enmity, inhumanity, or unkindness, to such inferior race, but on the great principles of self-preservation, which have induced civilized nations in every age of the world to regard them as only fit for slaves, as wholly incapable, morally and mentally, of appreciating or practising, without enlightenment, the principles and precepts of the Divine and natural law, upon which the laws of international comity are founded.

In the entire absence of *all law,* conferring such right, the African can neither take nor hold property in this State, by deed or devise, by descent or purchase, except those free persons of color who are residing here *permissi.*

The freed negro does not become a citizen by virtue of his manumission here. It requires the act of the State to clothe him with civil and political rights, as well as with freedom from servitude. Before such act, conferring civil and political rights, notwithstanding manumission, he stands in the position of an alien friend, or alien enemies "*permissi,*" or specially permitted by law. Hence, free negroes in this State, *lawfully here*, are capable of all those customary rights which are founded on the *jus naturali* or *jus gentium*. Cobb on the Law of Slavery, 312, 313, § 384.

But free negroes or persons of color, not so specially permitted, or who are here in violation of our laws and policy, are entitled to no such rights. They are to be regarded as alien enemies or strangers *prohibiti*, and without the pale of comity, and incapable of acquiring or maintaining rights of property in this State which will be recognized by our courts.

It follows from these views, that the bequest to the free woman of color, by the appellant's testator, was void, and that the decree of the Probate Court should be affirmed.

SMITH, C. J., concurred.

HANDY, J., delivered the following dissenting opinion.

The first question in this case is, whether the appellee, Mrs. Bridault, who filed the petition, is the child and heir of Hall, the deceased?

And, upon that point, I think there is a clear and very decided preponderance of evidence showing that she was not the daughter of Hall. The strongest evidence in the case, upon the point, is the declaration of Hall. It appears that she had been for a long time a member of his family, first in New York and afterwards in New Orleans; and, although he called her his child in common conversation, and frequently spoke of her as such, to indifferent persons, yet he repeatedly declared, under the most solemn circumstances, that she was not his child, except by his having taken her into his family and supporting and educating her, having no children himself. These declarations were made seriously, and under such circumstances as entirely to exclude the supposition that they were

false—to confidential friends, and to the priest of his church, and to his executor, and to the draftsman of his will. They are corroborated by the reputation among acquaintances in New York, where she is said to have been taken by Hall into his family, and by the circumstance of the improbability of her being the child of Hall's wife, who is shown to have been childless for many years after her marriage, in France, to Hall, and who does not appear to have had any other child after the introduction of the appellee into Hall's family.

The alleged undue influence under which these solemn declarations of Hall were made, appears to be insufficient to destroy or impair their force, and I consider them conclusive of the fact that she was not his daughter. This view disposes of the case.

But upon the main point considered in the opinion of the court, I do not concur in the views taken.

It does not clearly appear whether Marcelette Marceau is now a resident of this State or of Louisiana. The petition states, that she was "a free woman of color," and a citizen of Louisiana, when she was brought into this State by the appellant's testator. But what was her place of residence at the time the testator died, or when the petition was filed, does not appear. It is, therefore, not to be presumed that she was, at either of those periods, in this State contrary to our laws. She is alleged to have been a citizen of Louisiana, and the presumption is, that her rights and capabilities as such continue.

The question, then, as to her right, as a free person of color of the State of Louisiana, to take a legacy, is the same as that decided in *Shaw* v. *Brown;* and, upon the general questions considered in the opinion of the court, I have expressed my views in the case of *Mitchell* v. *Wells*, at the present term. Upon the general grounds therein stated, I dissent from the opinion of the majority of the court in this case.