And it was done accordingly.

## Case No. 9,277.

### MATHEWS v. SPRINGER.

[2 Abb. U. S. 283.] [1]

Circuit Court, S. D. Mississippi. Jan. Term, 1871.

SLAVERY—EMANCIPATION—DEVISE TO FREED SLAVES.

1. By the laws of Mississippi and Ohio, as they existed in 1858-59, where an owner of slaves, residing in Mississippi, voluntarily carried them to Ohio with the intent that they should thereby become free, such slaves became free. And they could not lose that status by returning, with their former master, to Mississippi for temporary purposes.

2. A devise of proceeds of real property, in favor of negroes formerly held as slaves, but who have been emancipated, is valid. So *held*, under the law of Mississippi, in reference to a case where the emancipation was by the act of the owner.

3. One who is entitled, by the terms of a will, to a share of the proceeds of land sold, as legatee, cannot be barred of his rights in respect thereto, by an adjudication made in proceedings to which he is not a party.

Hearing upon pleadings and proofs in equity.

The suit was brought by Isaiah J. Mathews and Caroline J. Mathews against Benjamin Springer, executor of the will of Robert L. Mathews, and others.

W. P. Harris and Upton Young, for complainants.

T. A. Marshall and J. B. Chrisman, for defendants.

HILL, District Judge. This cause is now submitted upon bill, answer, exhibits, and proof, from which the following facts appear, and upon which the questions to be determined arise:

Robert L. Mathews, a resident of Warren county, in this state, a man possessed of a considerable estate within this state, both

personal and real, was in the year 1858, the owner of a slave named Harriet, the mother of complainants, who were then his slaves, and whom he also claimed as his natural children, and whom he was anxious to emancipate and set free, Isaiah being then about seven, and Caroline about five years of age.

Not being permitted by the laws of this state to emancipate them here, and have them continue their residence here, he took them with him to the state of Ohio; and in the court of common pleas at the May term, 1858, of Hamilton county, in said state, executed a writing by which he declared them free and no longer slaves, and procured a decree of said court declaring them free persons of color, and remained with them in Ohio for some weeks, when he returned with them to Carroll county, in this state, where they remained until shortly after the death of said Mathews, which took place early in 1859; when, by the directions of Springer, one of the executors named in the will of said Mathews, they returned to the state of Ohio, where they have since remained. Said Mathews on February 20, 1859, made and published his last will and testament, and on March 26, 1859, died in said county of Carroll, in this state; and on April 25, 1859, said last will and testament was duly proved and admitted of record in the probate court of Warren county, the place of residence of said testator at the time of his death.

The testator, leaving no widow or legitimate children as the natural objects of his bounty, after providing in his will for a number of specific legacies to his collateral relatives and friends, directed that his executors should sell and convert the residue of his estate, real and personal, into cash, and deposit the same in the State Bank of Louisiana; that complainants should be maintained and educated out of said funds until they were twenty-one years of age, when the remainder should be divided between them, the said Isaiah Jefferson receiving two-thirds, and Caroline Josephine one-third; with the further provision that if anything should happen by death or otherwise that his said children should not receive said bequest, that the same should go to said bank for the use of the stockholders.

In June, 1860, the heirs at law and next of kin to said testator filed in the probate court of Warren county their petition against said Springer, who had qualified as such executor, and had proceeded to the execution of the trusts under the will, and also against Downs and Johnson, the other two persons nominated in the will as co-executors with said Springer, and against the said bank, and naming the complainants as defendants thereto, but taking no other steps against them. The petition alleged that complainants were slaves, and could not take the bequests provided for them in said will, and that the bequest to the bank was void, because there was no such corporation in ex-

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

istence, and that the pretended devise and bequest to the bank was intended, not for the benefit of the bank, but for the benefit of complainants, and that this provision in the will, as well as the pretended emancipation of complainants, were both attempted frauds on the laws of the state of Mississippi, and against its policy, and void.

To this petition the said Springer and the Louisiana State Bank, which claimed to be the bank intended in the said will, answered the allegations in the same. The court dismissed the petition as to complainants, for the alleged reason that they were slaves, and could not take under the will; and dismissed the same as to said Downs and Johnson, because they had not qualified as executors; and as to said bank, for the reasons charged; and proceeded, according to the prayer of the petition, to declare said bequests to complainants and to the bank void, and ordered distribution of the estate, after the payment of the specific legacies, among the petitioners.

From this decree said Springer and the bank appealed to the high court of errors and appeals of the state, where the decree rendered by the probate court was affirmed; and proceedings were had to distribute the personal estate according to said decree. Subsequently, Springer made a final settlement, so far as he had executed the trusts under the will; and the defendant, Diggins, was appointed administrator de bonis non, with said will annexed. No notice of complainants or their interest was taken in the proceedings in said probate court, nor were they in any way brought before it.

Complainants, by their next friend, filed this bill at December term of this court, 1868, for the purpose of setting up and enforcing the provisions made for them in said will, notwithstanding the proceedings so had in the said probate court, and so affirmed by the high court of errors and appeals. alleging that their father, the said R. L. Mathews, took them to the state of Ohio with the purpose of emancipating them, and that he did so emancipate them, and with the purpose that they should remain citizens of that state, and receive an education, and the advantages of free persons. That afterwards he returned with them to Mississippi, to remain a short time only; and in a short time they were to be returned to the state of Ohio as their permanent home. During their stay in Mississippi, after their emancipation, they occupied the position of citizens and residents of Ohio, as far as they were capable of doing so, and were only in Mississippi temporarily. That not having been parties to the proceedings in the probate court and high court of errors and appeals, they were not affected by any of the proceedings therein; and that they are now entitled to all the provisions in their behalf made in said will, so far as said estate can be collected.

To this bill, said Springer, Diggins, T. A. Marshal, and H. H. Miller, R. S. Buck, Reason Wooley and wife Elizabeth, and Hampton H. Griffith and wife Susan, have filed their answers, admitting the execution of the will, its probate, and the proceedings had under it, as first above stated, but denying that said Robert L. Mathews took complainants to Ohio with the intention of their remaining there; alleging that his proceedings were intended as a fraud and evasion of the laws of this state; and that complainants were, at the time of said Mathews' death, his slaves in this state, and a part of his estate, and incapable to take anything under his said will; that any pretended rights they may claim under said will are concluded against them by said proceedings had in the probate court, and affirmed by the high court of errors and appeals of this state.

The questions to be determined by the court are: (1) Did the complainants become free persons of color in the state of Ohio; and if so, was their condition changed to a state of slavery when they were brought back to the state of Mississippi, and at the death of the testator? (2) If they were free persons of color at the death of the testator, were they capable of taking under the provisions in their favor in the will? (3) If free persons of color, and capable of taking under the will, are they now precluded from the provision made in their behalf, by reason of the proceedings and decree of the courts above referred to?

These questions, if raised in this court before the attempted severance of this and other states from the Union, would have been regarded as of peculiar interest. For many long years a heated sectional controversy had been carried on between the people of the states where African slavery was maintained, and of those where it was forbidden. This controversy existed before the formation of the Federal Union; and as a compromise, and to avoid more serious results, provision was made in the constitution for the reclamation of persons held to servitude in one state, who might, without the consent of those entitled to their service, flee to those states where such service was forbidden.

But the result of the late bloody war has been to emancipate all of the race, so long the bone of contention between the slaveholding and the non-slaveholding states; all are now free, and, under the constitution and laws, enjoy equal rights as citizens of the United States, and of the several states, as did the white race before this change in the condition of the other race; so that we approach the consideration of the questions presented as we would any other question involving only pecuniary rights and remedies.

The changed condition of the race to which the complainants belong, has nothing to do with the questions to be determined. Their rights, if any they have, are to be determined under the law as it existed at the time of the death of Colonel Mathews, the testator. If they were incapable from their condition on

account of race, color, or condition of slavery, then or before that time existing, to take under the provisions made for them in the will, they are now incapable to do so; so that we must, in considering all the questions presented, place ourselves back at the time of the death of the testator, and the time his estate should have been administered and the trusts in the will executed, had no change taken place.

The first question for determination is, did the complainants become free persons of color in the state of Ohio in consequence of their having been taken there by the testator, who was then their owner, and the proceedings there had by him as stated?

In the non-slaveholding states I believe it has always been held that when a slave was removed to their territory, or was permitted to go there with the intention upon the part of the owner that he should remain, he at once became free; and I am not aware of any contrary ruling by the courts of any of the Southern or slaveholding states; so that if the proof establishes the fact that it was the intention of Colonel Mathews that they should remain there when he took them into that state, they at once, without more, became free, and no change of purpose on his part, or any other act of his could change their condition. In the case of Rankin v. Lydia, 2 A. K. Marsh. 813, it is held that no law, at least in that state, could bring into slavery one over whom it has ceased to exist. As stated by the judge who delivered the opinion of the court: "It would be a construction without language to be construed, implication without a scrap of law, written or unwritten, statutory, or common, from which the inference could be drawn, to revive the right to a slave when that right had passed over to himself." But we are left in no doubt as to their then condition according to the law of Ohio, as expounded and settled by the supreme court of that state in the case of Anderson v. Poindexter, 6 Ohio, 622, in which it is held that a slave being permitted by the owner to go into Ohio, no matter for what purpose, thereby became free as soon as he entered that state. This, it is true, is contrary to the holding of the courts of most of the Southern states; with perhaps the single exception of Louisiana, the Southern states claimed and their courts, with the exception mentioned, held that the taking of a slave to a non-slaveholding state, with the intention of only a temporary sojourn or a mere transit through the state, did not communicate freedom to the slave. But conceding that the complainants were taken to Ohio by the testator with the intention that they should be free, there can be no doubt but that they became free, and there is no doubt but such was his intention and purpose. And it may as well be said now as again, that the preponderance of the testimony is that he intended that they should become residents of the state of Ohio, and enjoy all the rights of free persons of color resident within that state, although he would have greatly preferred that during their minority they should have remained with him in Mississippi, if they could have enjoyed the same advantages here. The testimony all goes to show that he was a man of intelligence, and understood the laws of Mississippi upon the subject, and knew that they could not be permitted to remain in Mississippi after the notice given them to depart from the state; he further knew that they could not be permitted to enjoy the benefits of an education in this state.

At the time he brought them back to Mississippi, they were too young to be at school; they were also too young to produce any of the evils which free persons of color residing in the state were supposed to exert as an evil influence on the slave population of the state. I am, therefore, satisfied that the complainants did become and were free persons, from and after they were so taken to the state of Ohio, even upon the view entertained by the people of the slaveholding states, and that expressed by their highest tribunals, and were then entitled to all the rights appertaining to free persons of color in the state of Ohio.

The next branch of the first inquiry is, did complainants lose the rights so conferred upon them, by being brought back to Mississippi? It is contended by defendants' counsel that they did, and the case of Hinds v. Brazealle [3 Miss. (2 How.) 837] is referred to as authority to maintain this position. That was a case in which the owner had carried a slave to the state of Ohio and executed a deed of emancipation with an intention of immediately returning with the slave to the state of Mississippi, and had done so to avoid the laws of the state of Mississippi, and to give to the slave so intended to be emancipated, the rights and privileges of a free person of color here, as though the emancipation had taken place here; it was held to be a fraud upon the laws of this state, and, therefore, void in this state, notwithstanding the act might have been held valid in the state of Ohio; and that to allow the emancipation of slaves to remain in this state was contrary to the declared policy of the state, as shown by the general course of legislation on the subject. The case reported in 1 Rand. (Va.) 15, was referred to in that case, and is relied upon in this. These cases would be applicable in this case were the facts similar, but, as already stated, the weight of the evidence is that the testator did not intend to return with them to this state when he took complainants to Ohio. The will itself, made but a short time afterwards, shows that he did not intend them to receive or enjoy the property here, and is a strong circumstance against his intention that they should remain here for any considerable length of time. The estate intended for them was all to be converted into money and deposited in the State Bank of Louisiana, in the city of New Orleans. The complainants were

to be supported and educated out of it. These educational opportunities could not be obtained in this state, or in any one of the slave states; at least they could not be in this state, and could not in any other slave state as they could in Ohio. Taking all the proof together, I am satisfied it was the intention of the testator that complainants should be returned to Ohio to remain, and that they should enjoy his bounty there, or at least not in this state; and that this case does not fall within the principles of the case of Hinds v. Brazealle, and that complainants were not the slaves of the testator at his death, but were free persons of color, temporarily in this state, just as it was contended by the Southern states, that slaves might be taken to a non-slaveholding state, and remain temporarily without becoming free.

Upon a careful examination of the provisions of the Code of 1857, then in force, no prohibition of law can be found against their doing so, had they been adults, and much less so when they were infants incapable to violate the law, or suffer its penalties. Article 80, § 12, c. 33, of the Code, provided that it should not be lawful for any free negro or mulatto to emigrate to, and become a resident of this state, and provided as a penalty that any justice of the peace might give him ten days' notice in writing to leave the state, and if he did not do so, issue a warrant, and cause him to be apprehended; and authorized the board of police to order him to be sold by the sheriff to the highest bidder as a slave for life, the proceeds to go into the county treasury; and further provided, that free negroes and mulattoes then in the state without leave might be dealt with in the same way. It will be observed, that to incur this penalty, the free negro or mulatto must immigrate to the state, and must further become a resident of the state; in other words must make it his home. This cannot be said of one who came here to remain temporarily, or for a short time; such a person cannot be considered a resident. Again, no penalty was incurred until after the ten days' written notice had been given, and a failure to depart on the part of the person so here without authority, and until this was done no law could be held violated. Thus three things were necessary to subject him to this severe penalty: First, he must emigrate to the state; secondly, reside in the state, that is, make it his home; thirdly, he must refuse or neglect to leave the state after having first been served with a written notice from a justice of the peace to leave the state, being allowed a temporary residence in the state after the notice, all of which pre-supposed that the party was capable of acting, and where action, or non-action, was a crime, the commission of which was visited with the severe penalty of becoming a slave for life. Such a penalty it cannot be supposed the legislature intended to inflict upon an infant incapable of committing any other crime.

No provision is made by the Code for a free negro brought into the state in infancy. The statute in force before the adoption of the Code of 1857 did provide, that after they arrived at the age of sixteen years, and upon thirty days' notice to leave the state, and a refusal, they might be sold for one year. Upon a careful examination of the subject, I am satisfied their residence here, under the circumstances, was not a violation of law. And without the same being as a punishment for some crime of which the party was convicted, I know of no law by which a person once a slave, but freed therefrom, could be returned to his former condition of slavery; even his own voluntary agreement could not bind him to servitude for life, much less, if a female, to transmit the condition of slavery to her children. The theory in the case of Hinds v. Brazealle is, that the slave mentioned never was free.

Having determined that complainants were, at the time the testator made his will, free persons of color, permanently domiciled in Ohio, and only temporarily here, they were entitled to hold all the rights and provisions made for them by the will, which they could have done had they always resided in Ohio; and which brings us in the investigation to the next point of inquiry, and that is, what are those rights?

Defendants' counsel deny that they could then or now acquire anything, and rely upon the cases of Heirn v. Bridault, 37 Miss. 209, and Mitchell v. Wells, Id. 235, to sustain this position. These two causes were decided by the court at the same time, under the same circumstances, involving the same questions as to principle, and the judges were divided in opinion in the same way, so that the consideration of the one may be considered as the consideration of the other, with this difference in the facts; that in the former case the free negro had never been a slave in this state—only a resident free negro—and in the latter had been a slave in this state, and was taken by her owner to Ohio, and there emancipated by deed, and only remained there some eighteen months, when she returned to this state, and resided with her former owner as a servant in his family, until September, 1848, about one month after the death of the testator, when she married a free man of color who resided in Jackson, Mississippi, and resided with him here until 1851, when she returned to Ohio. In the former case the beneficiary in the will was a free woman of color, and came with the testator from New Orleans to this state, and resided with him as the mistress of his family, and had done so for a number of years before his death.

The principles announced by the judge who delivered the opinion of the court in this case, were that "alien free negroes and mulattoes, being without the protection of the Federal constitution as citizens of the United States, and being of a barbarian race, with whom

civilized nations have no commercial, social, or diplomatic intercourse, and hence regarded as perpetual enemies (though no war be waged against them), are incapable of taking or holding any species of property in this state; and a devise or legacy to any person of that class was absolutely void; and that all free negroes and mulattoes coming into this state from other states, were to be treated as alien enemies, and to have enforced against them the strictest rule of the ancient law applicable to alien enemies, except as to life and limb."

The same judge, in delivering the opinion of the court in Mitchell v. Wells, uses this language: "The policy of Mississippi being against emancipation, either here or elsewhere, of slaves once domiciled within her limits, her courts will not give any effect to the emancipation of a Mississippi slave in another state; and a slave so manumitted cannot, therefore, take or hold any property in this state, or maintain any suit in her courts." Although the facts in these cases are dissimilar to those in the case under consideration, it must be admitted, if the principles announced are held to be binding on this court, as is claimed, they would be decisive against the complainants. But upon a careful examination of the statute on wills, and of the authority to bring suits in the courts of the state, no prohibition will be found against such a disposition by a testator of his estate, or of its enforcement in the courts of this state. Therefore, there is no statute to construe making any such provision; and when left to judicial construction of the policy of the state, this construction will be found not to be the uniform construction given by the supreme court of this state.

In the early case of Leech v. Cooley, 6 Smedes & M. 93, it was held, that where a testator, by his will in 1836, directed his slaves to be set free, and sent to Indiana or Liberia, as they might prefer, and directed also a sale of his property, and part of the proceeds to be paid to his slaves thus liberated, the will was held to be valid, and that the executor could proceed with its execution; and that the bequest to the slaves was not void for want of capacity in the slaves to take. If they did not comply with the terms of the will, it was void; but if they did, it was valid. In the more recent case of Leiper v. Hoffman, 26 Miss. 615, it was held, where a conveyance was made to a negro over whom the owner had ceased to exercise acts of ownership, who had not been emancipated according to the laws of the state, but who afterwards removed to the state of Ohio, and by the acquiescence of the owner, and the residence in that state, afterwards became free, that she was entitled to the property conveyed, and to the right to bring and prosecute her suit for its recovery in this state. The learned judge, in delivering his opinion, held, that the principle announced in the case of Hinds v. Brazealle did not apply, and that the devise in that case was declared void, for the reason that the attempted manumission was intended to take effect in this state, in fraud of its laws; and in support of the principles decided in Leiper v. Hoffman, referred to the case of Ross v. Vertner, 5 How. [46 U. S.] 303, in which it is held, that it was not against the policy of the state of Mississippi for the owner of slaves to send them to Liberia, there to remain free, and that such a trust in his will was a valid trust.

But in the still more recent case of Shaw v. Brown, 35 Miss. 246, decided after the passage of the Code of 1857, the court held, that the owner of a slave domiciled in this state might lawfully remove him to another state, where emancipation is allowed, and manumit him in accordance with the laws of that state, and that the power so to do resulted from the absolute dominion of the owner over his property, and was not prohibited by the laws of this state, or against its policy, but was expressly recognized by the act of 1842; and I will here say, that the provision of the Code of 1857, when properly construed, does not conflict with the act of 1842 in this particular. Article 9, § 3, c. 33, which was doubtless in the mind of the learned judge who delivered the opinion of the court in the cases of Mitchell v. Wells and Heirn v. Bridault, does not apply to the case of an owner of a slave taking him to another state, where emancipation is allowed, and emancipating him, but refers to a case where provision is made for the emancipation of a slave after the death of the owner, the reason for which doubtless was to prevent slaves from importuning their owners, when old, or infirm in body and mind, to make such provisions for them; and the still stronger reason, that when such provision was made, the slaves so provided for might, in their eagerness to obtain the boon of freedom, take means to hasten it by procuring the death of their owner and benefactor. Article 97, § 14, c. 33, provides, that if any person shall take any slave from this state for the purpose of emancipating such slave, or if, having been emancipated elsewhere, such emancipated negro shall return to this state, or be brought back by the former owner, such former owner shall in no case be allowed to protect such emancipated negro, or to claim any right or authority over them; but such negro shall be dealt with as a free negro being in the state without authority. This provision shows clearly that the legislature did not intend to prohibit persons from taking their slaves out of the state for emancipation, but only intended to prevent their return and residence here, by cutting asunder all the relation between the former owner and the slave after such manumission. If, in the case of Hinds v. Brazealle, the provisions of the Code of 1857 had been in force when the slave was taken to Ohio, the court would have held him free upon his return to Mississippi, but without lawful authority to

remain. The case of Shaw v. Brown, whilst it decides that when the slave is taken by the owner to another state and manumitted, with the intention of an immediate return and residence in this state, it is a fraud against the laws of this state, and void, holds, that such intention must be immediately connected with, and made a part of the transaction of the emancipation; and also, that if the intention to return after manumission be abandoned, such intention, after abandonment, will not impair the rights of such free negro.

It is also held, in the same well-considered case, that it is not true that the states of the Union extend to each other no other rights than those given by the constitution of the United States; but on the contrary, the principles of private international law and the comity of nations apply with greater force, as between the inhabitants and citizens of the several states, than between foreign nations: and refers to the case of the Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519.

It is further held in that case, that although free persons of African descent were not citizens of the states in which they resided, within the meaning of the constitution of the United States, yet, though they were an inferior and subordinate class, having no rights except such as those who held the power of government might choose to grant them, they were, nevertheless, subjects and inhabitants of, and derived their rights of person and property from the states of their residence; and, by the comity of nations, they were entitled to the enjoyment of their rights in every other state in the Union, unless the exercise thereof was positively prohibited, or incompatible with the laws and policy of the state in which they were claimed; and further, that free negroes of other states are not regarded as outlaws, banished people, or alien enemies in this state, and as such entirely without the protection of our laws; but such persons, being inhabitants of co-states, are entitled, upon reasons of comity, to enjoy here all the rights secured to them in the place of their domicile which are not positively prohibited by law, or contrary to the public policy. And that the ingress and residence in this state of free negroes from other states was prohibited, but that the reason of that policy was in reference only to their presence and residence here, and in consequence of their improper influence with the slaves in this state, and the force of their example in producing discontent and insubordination in the slaves; and hence they were only debarred from exercising here such rights as required their personal presence. And that a free negro of another state might, therefore, lawfully be a legatee of a pecuniary bequest, which is directed by the will to be raised by the sale of the testator's plantation and slaves, and paid to the legatee out of the state,—just the provision made in the will of Colonel Mathews. Indeed, it is probable that this will was made with a full knowledge of this decision, the decision being made in April, 1858, and the will in the February following. The principles laid down in the case of Shaw v. Brown, are not in conflict with any decision made in the state, or with any law of the state, but are sustained both by the decisions in the cases stated, and the statutes, with the exception of the cases of Heirn v. Bridault, and Mitchell v. Wells, the weight of which as authority, is greatly weakened when it is a matter of public history that they were made during a time of great public excitement between the people of the slaveholding and non-slaveholding states; in none of which was this excitement greater than our own.

Judges, no matter how learned they may be, and honest of purpose, are subject to like influences with other men, and it would be strange if under such excitement and pressure of public opinion, they would not sometimes come to conclusions to which they would not come under other circumstances. But this is not the only reason that goes to weaken the weight of these cases as authority. While, so far as they related to the cases then before the court, they were the judgment of the court, and to be respected as such, yet the conclusions to which the majority of the court came were not those to which all the members of the court arrived. The learned judge who had delivered the opinion of the court in the cases of Leiper v. Hoffman, and Shaw v. Brown, was so convinced of the incorrectness of many of the opinions expressed that he deemed it his duty to deliver well-considered dissenting opinions in each case, in which the reasons given by him were then and are still to my mind much more convincing and satisfactory. The decisions of the court of the state as to her laws and public policy, to be authority, must have been continuous and uniform. Those that are conflicting, and especially those made under public excitement and pressure of public opinion, have been held by the supreme court of the United States not binding on that court; nor are they on this. In the case of Pease v. Peck, 18 How. [59 U. S.] 595, Mr. Justice Grier, in delivering the opinion of the court, uses this language: "When the decisions of the state court are not consistent, we do not feel bound to follow the last, if it is contrary to our own convictions; and much more so is that the case when, after a long course of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines subversive of former safe precedent." The same doctrine is held in recent cases in Wallace.

I am satisfied, from a careful examination of the facts and the law bearing on this point, that the complainants are entitled to have the trusts in their favor in the will of the testator executed, unless they are barred therefrom by the proceedings had in the probate court of Warren county, affirmed in the high court of errors and appeals. The defendants'

counsel insist that they are; and this is the third question presented. It is insisted that the will directed the entire estate to be converted into money, and that such direction made the bequest personal, and not real estate; and that such being the case, the executor was the only necessary party before the court; and that the decree of that court declaring the complainants slaves, and incapable of taking under the will, is conclusive, and bars them from any right under the will; and numerous authorities are referred to to sustain this position. It is conceded that the general rule is, that real estate directed to be sold and converted into money will be treated as money, and money directed to be vested in the purchase of real estate will be treated as real estate. It is also true that the executor, as against all persons claiming the personal estate other than as legatees or distributees, does represent the personal estate, and none others need be made parties, as the executor represents the legatees or distributees, and also the interest of creditors, if the claimant is other than a creditor; and the judgment for or against him, in his representative capacity, binds those whom he represents; but after the debts and all other claims upon the property or fund are satisfied, and nothing remains but to appropriate the residue to the legatees or distributees, the executor ceases to be a representative, and becomes simply a bailee, holding the property or funds for those who are of right entitled to it; and the question as to whom it may belong is one in which the claimants are alone interested. It is a rule of law, too well settled in this state to be controverted, that no one can be deprived of his interest by judicial judgment, without being, by himself or a proper representative, made a party to it, with an opportunity to defend his rights. Where there is a right, there must be a remedy. Thus, the statutes of the state provide that, before a guardian's, executor's, or administrator's final accounts shall be confirmed, all the parties in interest must have been first cited to appear, and have an opportunity to show cause to the contrary, if any they have, why the same shall not be done, and for the reason the questions involved are alone between those entitled to the estate and the fiduciary agent in whose hands it has been placed. And when proceedings are to be had for the division or distribution of the estate or fund, all parties in interest must be before the court, because they, and they only, are interested in the decree that the court may pronounce. I am aware of no case in which a decree has been held binding upon one claiming an interest in an estate as legatee or distributee, who had not in some way been made a party to it, and by which decree he was deprived of his interest and right in the thing claimed.

There is no dispute as to the validity of this will, so far as to the forms of the law being complied with, and the testamentary capacity of the testator, or the validity of the other devises and bequests therein. The contest was one in which those claiming to be heirs at law and next of kin of the testator were parties on the one side, and these complainants and the bank on the other. These complainants were in no way made parties to it, and cannot in any way be bound by it. If they could have been bound by it, it would have had the effect of reducing them again to a state of slavery for life, without giving them a day in court—a proposition that would not, upon calm reflection, even in that day of excitement, have been maintained by any jurist. Indeed, the very Code, the provisions of which have been so earnestly invoked to sustain the defense, makes provision that any one held in slavery who claims to be free, may assert that right in the courts of this state; and makes provision for the protection of the slave against his master during the litigation. The rules of law and reasons against this point of defense are so palpable, reference to authority or further comment is, unnecessary; and it must be held that the trusts under this will in favor of the claimants, as far as it can be done, must be enforced and executed. The will was admitted to probate on April 25, 1850, and was and has been notice to all the world of the trusts and provisions therein made: Consequently these heirs and next of kin of Colonel Mathews, and those who held under them, must be held chargeable with notice of the rights of claimants under the will. It cannot be held that their assignees are protected by the decree in the probate court, for they must be held to know the whole proceeding, and that it was without notice to complainants, and that they were not bound by it, for the reasons already stated. It is, however, contended by defendants' counsel, that this court can render no decree in this cause in favor of the complainants without having all the heirs at law of Colonel Mathews before it, who would have been entitled to the estate after payment of the debts and other legacies, had he died intestate, and that most of them being nonresidents of the state, have not been, and cannot be made parties, and that their interests are so blended that no decree can be rendered against those who are parties that will do justice to them. There is no controversy between the persons provided for in the will. The will being established and the complainants being entitled to the trust in their behalf, there are no parties in interest except those who have had the estate in possession. I am aware of no law or rule which requires the heirs at law or next of kin of a testator to be made parties to a proceeding to enforce the trusts created by the will, and for the very plain reason that they have no interest in it. Indeed, rule L., adopted by the supreme court, expressly provides that they shall not be made

parties; but in a bill to establish the will, and not for the enforcement of the trusts in it, then they may be parties; and such will be found to be the rule in all equitable proceedings. It is very different from a proceeding against those entitled to the trusts under the will; as we have seen, beneficiaries under the will are the parties directly interested.

The result is, that as these complainants were in no way before the court when Springer the executor's final account was confirmed, they were not bound by it, and he must account for the estate that went into his hands, and the administrator with the will annexed must account for the estate that went into his hands. The property, real and personal, that remains, must be sold, and the proceeds loaned at interest, or vested in safe securities until, as provided by the will, the complainants shall become twenty-one years of age; or, if Caroline shall marry, her portion then to be paid to her. There having been a misdescription of the bank intended as the custodian, and, upon the contingency mentioned, the beneficiary under the will, this part of the provision of the will must fail. If, however. any of the specific legacies under the will have not been satisfied, and are chargeable upon the fund to be raised as aforesaid, they must be first paid; whether such is the case or not, will be a subject of future inquiry. Decree accordingly.