# CASES

## ARGUED AND DECIDED

IN THE

# SUPREME COURT OF MISSISSIPPI.

### APRIL AND OCTOBER TERMS, 1871.

---

## EDMUND BERRY, Admr., v. J. B. ALSOP, Admr.

1. SLAVES—EMANCIPATION—REMOVAL TO ANOTHER STATE—CAPABLE OF TAKING PROPERTY HERE.—The owner of slaves in this state might voluntarily take them to a state which did not tolerate slavery, and there emancipate and leave them, and this contravened neither the law nor policy of this state, but conferred freedom on the slave; and persons thus emancipated, and resident in a state where slavery did not exist, are capable of taking real and personal property here, and may prefer and vindicate their rights in the courts of this state.

2. SAME—CASE UNDER CONSIDERATION.—The testator resided for many years in Mississippi, where he acquired considerable estate, real and personal, and then removed to Kentucky, and died there. While a resident of this state he carried several of his slaves from this state to the state of Ohio, where he manumitted and left them. By his will he directed a considerable portion of his estate in Mississippi to be converted into money, to be invested in lands in Ohio, to be conveyed to the persons emancipated: Held, that these persons were competent to take under the will, and were necessary parties to the proceeding in the probate court for the final settlement of the estate of the testator.

3. CASES CITED AND DISAPPROVED.—The cases of Mitchell v. Wells, 37 Miss. 235, and Heirn v. Bridault, ib. 209, are cited and disapproved.

APPEAL from the probate court of Yazoo county.

The opinion of the court fully shows the facts of this case

*Wilkinson & Bowman,* for appellant.

*Miles & Epperson,* for appellee.

No memorandum of the arguments of counsel has come to the hands of the reporter.

SIMRALL, J.:

A suit was instituted in the probate court of Yazoo county, in February, A. D. 1867, by Thomas B. Alsop, administrator of John Alsop, deceased, to induce a final settlement of the estate of Jesse Alsop, deceased, so far as Samuel Redding, the executor (who had deceased), had proceeded. Edmund Berry is the administrator of Samuel Redding, deceased, and he was ordered by the court to state a final account so far as his intestate had proceeded, in execution of the will of the testator.

To this proceeding the heirs at law of Jesse Alsop, the testator, were made parties, and were warned in by publication.

Sundry exceptions were taken to the account, which were sustained by the court below. Application was also made to continue the cause, for taking further testimony in support of the credits, which was refused.

And these rulings of the probate court are assigned for error in this court.

The will of Jesse Alsop was read at the hearing and is part of the record.

Among other facts, it was shown, that the testator resided for many years in Yazoo county; that several years before his death he removed to the state of Kentucky, and was domiciled there at the time of his death, which occurred in the summer of 1856. In the January preceding, he made in that state a last will and testament, which was proved and admitted to record in the county court of Washington county.

A copy of the will and probate was brought to this state, and filed in the probate court of Yazoo county, which

granted letters of administration, with the will annexed, to said Redding.

The property and choses in action, belonging to the testator in Mississippi at the time of his death, exceeded in value $20,000. He also left property, apparently of considerable value, in the state of Kentucky. The real and personal property in this state had been sold by the testator shortly before his death ; for a large part of it he held the notes of solvent purchasers.

Redding before his death stated two annual accounts, by both of which he was left debtor to the estate for large balances.

By the third clause of his will, the testator directed his executor (after the payment of a special legacy to his brother) to convert all his property in Mississippi into money, and apply the same to buy land and real estate in the state of Ohio, to settle upon Mary and her six children, Virginia, Malinda, Ann, Mortimer, Sam, Celia and Elizabeth, whom "I (quoting the language) have heretofore emancipated, and set free in said state of Ohio, and who now reside in Clermont county, Ohio. It is my will, and intention, that after all my just debts are paid," (and the special legacy) "that all the estate I own in the counties of Yazoo and Madison, in the state of Mississippi, shall be converted into money, and the money invested in lands and other real estate in Ohio, to be conveyed to Mary and her six children, equally," etc. "And I do hope that my executor, or whoever may act in that capacity, will carry out my wishes in this clause of my will, as it is the great desire of my heart."

The petition states, that the woman Mary was a slave of the testator, and that she and her children were taken by him to Ohio, before his death, and there made free, and that this was in fraud and evasion of the laws of this state, and its public policy. It is further averred, that the removal of Jesse Alsop to the state of Kentucky, was in furtherance of this fraud and evasion of law and policy.

The answer admits the facts to be as stated in the petition, but submits to the court the question of law, whether the devises and bequests to Mary and her children are legal and valid or not.

It is expressly required by the statute, that all persons interested in the estate of a decedent, as legatees or distributees, be made parties to the final settlement. It has been repeatedly decided, that the decree passing the final account is void as to those not legally notified of the settlement.

The important question necessarily arises, whether the bequests and devises to Mary and her children are valid or not. If valid they are the parties who take the estate in Mississippi, or the bulk of it, and no legal, final settlement of the estate can be made in their absence from the proceedings. The parties to this record and the probate court have proceeded on the postulate that they have no interest in the subject-matter of this litigation.

This involves an inquiry into the legislation and judicial decisions of this state, as to the status and rights of free persons of color.

The act of 1822 allowed the owners of slaves to emancipate them by last will and testament, or by deed, to be approved by the legislature.

The revised constitution of 1832 expressly permitted the legislature " to pass laws to permit the owners of slaves to emancipate them, securing the rights of creditors, and preventing them from becoming a public charge." The act of 1822 and the constitutional provision certainly had reference to emancipation to be made and take effect in this state.

Under this state of the law the case of Hinds v. Brazile, 2 How. 837, was decided. Brazile took his slaves to Ohio, and went through the forms of an emancipation, and immediately brought them back to this state, where they remained. The whole stress of the opinion is predicated on the fact that the entire act of emancipation was an evasion of the law; that it was really an emancipation here, with

the intent and purpose of residence here. There is no discussion of the question, that a removal and emancipation in Ohio would be inoperative.

In Ross v. Vertner, 5 How. 360, decided in 1840, it was held, that it did not contravene the law and policy of this state for a testator to direct his slaves to be taken from this state and emancipated in another state or country, where freedom may be enjoyed. The principle laid down in Hinds v. Brazile is re-affirmed and approved, which is declared to be, that the emancipation and residence in this state, or an evasion and subterfuge to circumvent it, is the act interdicted by the law.

Prior to this was the case of Riche v. Daniel, 3 How. 337, which was a bequest directly of freedom to the slaves, and a direction of their removal elsewhere. The bequest was held void, because the emancipation was to be effective immediately here, which was prohibited by the law.

Similar to this was the will in Lucky v. Dykes, 2 Smedes & Marsh., but the doctrine announced in Vertner v. Ross is distinctly adhered to, and the difference in the terms of the bequest pointed out.

In Leach v. Cooley, 6 Smedes & Marsh., decided in 1846, the will manumitted the slaves, but their freedom to take effect on their removal out of the state. Such was the rule laid down in Wade v. Colonization Society, 7 Smedes & Marsh.

The principle, either distinctly announced, or plainly deducible from these cases, is, that while the positive law prohibited the emancipation of slaves by the owner in the state, and the public policy was against the increase of free persons of color in the state, yet there was no prohibition against the removal of the slaves to another state, and there emancipating them, nor against a bequest to the executors, to remove the slaves to some state or country where freedom could be enjoyed. These cases distinctly recognize the principle that there is no declaration of policy against manumissions in other states, or the freedom to be there enjoyed.

The act of 1842 made a further announcement of policy. Its main provisions are, that emancipation, by last will and testament, in any form, is prohibited, and a direction to any person to remove a slave for emancipation is unlawful. Slaves taken or sent out of the state and emancipated, who shall afterward be found in the state, shall be proceeded against as "free persons" of color, unlawfully in the state. The special objects aimed at by these provisions are : First : To prevent slaves emancipated out of this state by owners residing here from coming to this state, and to prohibit the emancipation of slaves, by last will and testament, to take effect out of this state. The statute does not embrace or touch the case of an owner who removes his slaves beyond the state and there emancipates, but declares against the return of such persons to the state, by directing that, if they shall be found here, they shall be proceeded against as free negroes unlawfully here.

It remains to ascertain what are the rights of free persons of color, who have been carried by their owners to a free state and there emancipated, and who have continued their residence outside of our borders.

In Leiper v. Hoffman, 26 Miss., suit was brought by Fanny Leiper (a free woman, who became free on a removal to Ohio, with the consent of her owner, and was a resident of that state) to recover real estate in the city of Natchez. The opinion gives this summary of the facts on this point : "The evidence shows that although not emancipated at the time (date of original purchase) her former owner asserted no claim upon her, and expressly recognized her as a free person. And it is further proved, that she afterward went to the state of Ohio to reside, and still resides there, where slavery is not permitted, and that her former owner acknowledges her to be free." Her claim was sustained, and she was permitted to recover. This case was decided in 1853.

Next follows the case of Shaw v. Brown, 35 Miss. 311, which was a bill in chancery brought by the next of kin to

enjoin the execution of certain trusts, in the will of James Brown, deceased, which are alleged to be illegal and void. The trusts referred to directed the executors to convert a large property in this state into money, and deposit the same in bank in New Orleans, subject to the draft of Jerome Brown, of Indiana, and, in a certain event, of Francis Brown. The bill stated that Francis and Jerome were slaves of the testator, carried by him to Ohio and emancipated, and brought back to this state, contrary to law.

In discussing this point, the court put the argument in this form : That in order that the emancipation be void, it must be with the intent of bringing the slaves back to the state, to reside as free persons, and this intent must be con- summated by an actual return. The emancipation and re- turn must be in immediate connection, as parts of the same design. The rule is declared to be, "That a voluntary emancipation of slaves, made in a state where it is allowed by law, is valid and confers freedom." The exception is, that if they are brought back to this state, immediately, to reside, it is an evasion of law, and the benefit of the emanci- pation is lost. The court declared that the cases of Hinds v. Brazile, Ross v. Vertner, Leiper v. Hoffman rest upon these principles.

"Brown (it is said) had unquestionably the right to take the slaves to another state where their emancipation was allowed. That right is not restrained by our law or policy, but is distinctly recognized by the statute of 1842. It was held, in this case (decided in 1858), that the free persons, Jerome and Francis, although they were not permitted, under the law, as it then was, to reside in the state, were entitled to the bequests in their behalf, and could sue in the courts of this state to enforce them.

It appears, from this review, that, for a period of thirty years, whenever our predecessors were called upon to pro- nounce on the subject, they uniformly declared, that if the owner of slaves voluntarily took them to a free state for the purpose of emancipation, and there left them, it con-

travened neither our policy nor law, but that such act con-
ferred freedom.   And second : That persons so emanci-
pated, and resident in a free state, were able to take property
and interests in property here real and personal.   And that
the courts were open to them to prefer and vindicate their
rights.   During this long period of time not a whisper of
dissent, to the principles thus declared in very many cases,
is heard from a single incumbent of the appellate bench.

A brief recurrence to the cases outside of this state, on
this subject, will show that these utterances of our court,
with the others, national and state, are in harmony.

By the general law of nations, no nation is bound to recog-
nize the state of slavery, as to foreign slaves found within
its territorial dominions, when it is in opposition to its own
policy and institutions in favor of the subjects of other
nations where slavery is recognized.   Prigg v. Common-
wealth of Penn., 16 Pet. 611, per Story, J.

It is further said in the same case, that, if the constitution
had not contained the clause for the rendition of fugitives
from labor, every non-slaveholding state would have been
at liberty to have declared free all runaway slaves coming
within its limits, and to have given them entire immunity
and protection against their masters.

The provision of the constitution, in reference to fugitives,
does not extend to the case of a slave voluntarily carried by
his master into a free state.   Buller v. Hopper, 1 Wash. C.
C. 499 ;   Commonwealth v. Holloway, 2 Serg. & Rawle,
305 ;   Commonwealth v. Aris, 18 Pick. 222 ;   Fields v.
Walker, 23 Ala. 155 ;   Priggs v. Commonwealth, 16 Pet. 611.

If a slave, carried temporarily into a free state by the
owner, returns, the law and policy of the latter applies, and
such return may operate to restore the slave to his former
relation ; as the courts of the forum, giving expression to
the policy of its laws, may determine.   2 Marshall, Ky. 470.

By the common law of England as expounded in Sum-
merset's case, and in Forbes v. Cochran, 2 Barn. & Cress.
448, a slave, whether coming from a colonial dependency

or elsewhere, became free by the mere fact of his coming into the British territory.

The case of Marie Louise v. Marat, 9 La. 473, asserts the same principle. The plaintiff was taken to France, by her master, and afterward returned to Louisiana. It was held, that if she was taken to a foreign country by the person claiming her services, where slavery had no existence, for the purpose of her residence, even temporarily, she would become free, which status would be permanent, and her former owner could not reduce her to slavery. To the same effect are the cases in 14 Martin, 401, and 16 La. 483.

Mr. Justice McLean, in his charge to the jury, in Vaughn v. Williams, 3 McLean, 537, says, that if the persons, claimed as fugitive slaves, "had been brought to the state of Illinois which prohibits slavery, from the state of Kentucky, and kept at labor for six months, under a declaration of the master that he intended to become a citizen of that state, there can be no doubt that the slaves are entitled to their freedom." The claimant was a citizen of Missouri, and the learned judge remarked: "This conforms to decisions repeatedly made in Missouri by its supreme court, and it is believed that there is no decision to the contrary."

In Anderson v. Poindexter, 6 Ohio St. 626, it is said, that by the fact of the slave being voluntarily brought into that state, by his master, her constitution and policy imparts freedom, which status the judiciary of that state will uphold and protect, in whatever form the subject may be brought before the courts.

Our examination of the books have brought us to the conclusion that the courts of all the states, slave-holding as well as free, agreed in the doctrine, that if a slave was carried by his owner into a free state for the purpose of domicile there as a free person, it was an abandonment of property in the services of the slave, and *ipso facto* conferred freedom, and that such person was entitled to all the rights, immunities and privileges accorded by such state to free persons of color. Or if such person went voluntarily to a free state,

with the consent of the owner (as in Fanny Leiper's case), such result was accomplished. And second, that such emancipated slaves had access to the courts of any other state to enforce rights and redress wrongs.

The adjudications of our predecessors, from 1838 to 1858, are in accord and harmony on this subject, with the decisions national and state.

In view of the overwhelming weight of authority resting upon principle and reasoning, so just and cogent, commending themselves to the full approval of our judgment and conscience, we cannot, in fidelity to our duty as expounders of the law in the last resort, yield our consent or acquiescence to either the reasoning or the judgment of a divided court, in the cases of Mitchell v. Wells, 37 Miss. 235, and Heirn v. Bridault et ux, ib. 209.

In doing this we place ourselves in harmony with what we regard as so firmly settled by judicial authority, that if a change is now desired it ought to have been effected by legislative power.

We are of opinion, therefore, that the bequests and devises to Mary and her children are valid ; that they had capacity to take and enjoy them ; that the trusts created for their benefit ought to be carried out, and, therefore, they are necessary parties to the final settlement.

The decree is therefore reversed, and the cause remanded with directions to the court to cause notice to be given to the said Mary and her children, and for further proceedings.