Frank Cowan et al. *v.* J. B. Stamps, Exr.

1. WILL — CAPACITY OF NEGROES TO TAKE UNDER IT — CASE UNDER CONSIDERATION AND CONCLUSIONS.— C. made his will in 1850, by which he directed that all his slaves be sent to Africa, there to become free; and that, for this purpose, his executors should take charge of the slaves and hire them out until a sufficiency was realized to pay their expenses to Africa and support them there for six months; and that his executors should immediately collect all debts due to him, sell all his property, real and personal, and, after paying debts and expenses, convert the surplus into funds suitable to be remitted to Africa, for the use and benefit of the negroes in Africa, to be equally divided among them, and died in 1864, at his residence, eight miles from the federal lines, and fifteen or twenty from the Confederate lines, in a section of country between the armies

of the two belligerents, frequented by scouts from both, but more frequently by those from the United States, and afterward receded from by the Confederate forces and left to federal control : *Held,* 1. That the rights of parties were fixed by the condition of things existing at the death of the testator, and the question of the validity or invalidity of the will is determinable by consideration of the public policy of the United States, rather than by that which had formerly prevailed in favor of slavery in the locality of the testator; and therefore that the will is valid; 2d. That the negroes were capable of taking under the will; and, 3d. As the provisions of the will were executory and its beneficiaries are now free from any disability to take, it should be executed in their favor.

2. SAME — EXECUTION OF THE TRUST FREED FROM THE CONDITIONS IMPOSED BY THE WILL. — Though the will contemplated a sale of the property and removal of its beneficiaries to Africa, they are now entitled to have it without a sale or their removal.

APPEAL from the probate court of De Soto county. HANCOCK, J.

· *L. V. Dixon,* for appellants.

*Powell & McKenzie,* for appellee.

TARBELL, J. :

This case originated in the probate court of De Soto county, and the question to be determined is created by the last will and testament of A. B. Cowan, deceased.

The deceased, a citizen of De Soto county, made his will in 1850, by which he directed : 1st. That all his just debts, subsisting at his death, be promptly paid ; 2d. That all his slaves with their increase be sent to Africa, under the direction and superintendence of the American Colonization Society, there to become a free people ; 3d. That for this purpose the executors named in the will shall take charge of the slaves, and hire them out for wages until a sufficiency of assets may be collected to defray their expenses to Liberia, in Africa, as well as a sufficiency for their support for six months after their arrival out ; 4th. He gives to his esteemed man, Frank, all his books and maps, to be held by his executors as trustees for his use, until such time as the said Frank shall be legally competent to take and hold said books and maps as a free man ; 5th. The will directs the

executors to proceed immediately to collect all debts due the testator, or his estate, and to sell all his property whether real or personal; 6th. After paying all necessary expenses and settling up the estate, the executors are directed to convert the surplus money into funds suitable to be remitted to Africa for the use and benefit of the devisees; 7th. Such residuary part of the estate as, after the payment of just debts and necessary expenses, is bequeathed to and for the use and benefit of said negroes after their removal out of this state and their manumission in foreign parts, to be equally divided among them; 8th. Barrett Graham and J. D. Williams of Memphis, and J. B. Stamps of De Soto county, are, by the will, named as executors. Lastly, the will is dated February 12, 1850. The testator died in April, 1864, and the will was probated at the September term, 1866, of the De Soto county probate court.

In 1868, J. B. Stamps, one of the executors named, filed a petition with said court for the sale of the lands of the estate for distribution under the advice and direction of the court. Notice was served upon resident heirs and others interested, and publication was made as to non-residents. The devisees, now free citizens, appeared, and, by their answer and cross-bill, set up their claim under the will, asking that the lands be not sold, but that they be set over, undivided, to them, freed of the condition of departing from the state, and from the United States; they charge that the debts of the estate are all paid, and that administration had been granted more than one year, wherefore they claim the entire estate as sole legatees. Some of the heirs of the deceased appeared and by their answer contested the right of the devisees under the will upon the ground that the devise was illegal and void by the laws of Mississippi. A. W. Smith was appointed guardian *ad litem* for the minor heirs of the deceased, and filed his answer in the case in their behalf.

The following agreement of counsel, in writing, was made and filed in the cause: "In this cause it is admitted by both parties that the following state of facts are true: Abner

Cowan, the testator, died April 28, 1864, in De Soto county, Mississippi, some eight miles from Germantown, a point on the Memphis and Charlestown railroad, held at that time and for a long time previously, by the federal forces ; that the Confederate lines were at Cold Water river, some fifteen or twenty miles further south ; that, every day or two, armed bodies of cavalry scouts came out from Germantown, as far as Cowan's residence, scouting that neighborhood, and that this state of things continued from a period many months previous to Cowan's death till the final surrender of the Confederate forces. It is also further agreed that parties of Confederate soldiers were frequently scouting through the same neighborhood, and that this territory was not inside the picket lines of either of the forces."

Upon the petition for sale, the cross-bill of Frank Cowan and associates, the several answers of the adult and minor heirs of the deceased, and the agreement of counsel, it was decreed, "that the prayer of the petition for a sale of said section of land ought to be granted, and that, owing to the great number of parties interested therein, whatever direction the proceeds thereof may finally take, said section ought to be sold and the proceeds secured for distribution. Therefore, it is ordered, that said executor of the deceased, after first giving bond, faithfully to account, *    *    * shall proceed to sell. *    *    * All other questions arising in this case are reserved to the coming in of the report of said sale, which said executor is ordered to make at the term of the court next succeeding the same," which was "ordered, adjudged and decreed, December 23, 1868." From this decree the case comes to this court on the petition of Frank Cowan and others, devisees named in the will.

Counsel upon one side insists that the will is void because in violation of the public policy of Mississippi, and we are referred to the laws of the state, and to the adjudications of our predecessors prior to 1860. For the appellants, it is urged, that under the change of public policy, as a result of

the war, the will is valid, and the devisees entitled to its benefits.

In this connection, our attention is naturally first drawn to the matter of public policy, upon which we observe great if not marvelous changes, following each other in rapid succession during the last few years, with reference to emancipation. By the constitution of 1832, power was given to the legislature "to pass laws to permit the owners of slaves to emancipate them, saving the right of creditors, and preventing them from becoming a public charge." This was only an incorporation into the supreme law of the state of the policy theretofore and for some years after pursued. The act of the legislature of 1822 (Hutch. Code, 523) provided, that slaves should not be emancipated, except by last will and testament, or other instrument in writing, and proof, to the satisfaction of the general assembly, of meritorious acts by such slaves for the benefit of the owners, or service for the benefit of this state. A modification of the previous policy took place in 1842, it being then enacted (Hutch. Code, 539), that "Hereafter it shall not be lawful for any person, by last will or testament, to make any devise or bequest of any slave or slaves for the purpose of emancipation, or to direct that any slave or slaves shall be removed from this state for the purpose of emancipation elsewhere," giving one year, however, after the passage of the act, in which to remove slaves theretofore emancipated, and, provided, also, that it shall be competent to emancipate by last will and testament, for meritorious services, such last will and testament being referred to the legislature for approval, before carried into effect. A later policy announced in the Code of 1857, ch. 33, § 3, p. 236, is in these words : "Art 9. It shall not be lawful for any person either by will, deed, or other conveyance, directly or in trust, either express or secret, or otherwise, to make any disposition of any slave or slaves for the purpose, or with the intent to emancipate such slave or slaves in this state, or to provide that such slaves be removed to be emancipated else-

where, or by any evasion or indirection so to provide that the colonization society, or any donor or grantor can accomplish the act, intent or purpose, designed to be prohibited by this article. Nor shall it be lawful for any executor, trustee, or donee, legatee, or other person under any pretense whatever to remove any slave or slaves from this state with the intent to emancipate such slave or slaves. But all such wills, deeds, conveyances, dispositions, trusts or other arrangements, made, had or intended to accomplish the emancipation of any slave or slaves after the death of the owner, no matter when made, shall be denied and held entirely null and void, and the said slave or slaves thereby attempted or intended to be emancipated shall descend to, and be distributed among, the heirs at law of the testator, grantor or owner, or otherwise disposed of as though such testator, grantor or owner had died intestate. Language certainly could not well be stronger, and the public policy of Mississippi from 1857 may be considered as indicated in the emphatic terms of the statute quoted, more strikingly enunciated in Heirn v. Bridault, and in Mitchell v. Wells, 37 Miss.

In 1865 another policy obtained, as sweeping, positive, and unconditional in the other extreme. In the mean time, however, revolution had swept over the land, resulting in the provision of the constitution of August, 1865, art. 8, § 1, that "the institution of slavery having been destroyed in the state of Mississippi, neither slavery nor involuntary servitude, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted, shall hereafter exist in this state." The destruction of slavery prior to August 21, 1865, was, by that constitution, assumed, but the time when such emancipation actually occurred, or the means by which it was accomplished, are not stated. It was declared before then to have been destroyed, and that it should not thereafter exist in this state. The fourth law enacted by the legislature which assembled in Jackson in October, 1865, under the constitution of that year, was

entitled "An act to confer civil rights on freedmen, and for other purposes." Section 1 enacts, "that all freedmen, free negroes and mulattoes, may sue and be sued, implead and be impleaded, in all the courts of law and equity of this state, and may acquire personal property and choses in action, by descent or purchase, and may dispose of the same in the same manner and to the same extent that white persons may." By section 2 of a law approved February 21, 1867, the foregoing sections of the law of November 25, 1865, was "so amended as to give to freedmen the same rights of acquiring, holding, with the same benefits and exemptions and disposing of real estate, as is allowed by said first section, in respect to personal property." A law of congress approved April 9, 1866, wherein, after declaring who are citizens of the United States, enacts, that "such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same rights, in every state and territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding."

Such is a brief presentation of the extraordinary vibrations of public policy on a single subject, in a few years, of which we shall make an application presently.

Referring to the will, we observe that it employs no technical terms or phrases. Its language is plain, simple and direct. The devise is absolute, unconditional and without limitation. The entire estate, after payment of debts and expenses, is devised to the same *cestuis que trustent.* The enjoyment of the bequest is not made conditional, or

dependent upon any contingency whatever. It is true that the freedom of the devisees was a necessary preliminary by the laws of the state, but, by the words of the will, no contingency is provided for ; and, by it, none existed, save that of successful transportation to Liberia, manumission, and the reception of the aid bequeathed by the testator. The mode of attaining freedom is pointed out, but emancipation is not made, by the will, a condition of the devise. In such absence of conditions, limitations, contingencies and technical terms from the will, certainly a rare as well as a commendable virtue, a case is not made for the complicated rules of the text-writers upon those subjects. For instance, the dissimilarity between the propositions presented by the record, and the subtle rules for the construction of wills and the determination of executory interests may be indicated at this stage of the discussion, by a repetition of the terms of the will, in the language of the testator, as employed therein, to wit : "In the first place I desire and direct" the payment of all my "just debts * * * subsisting and unpaid at my death. * * * In the second place, it is my will and desire, and I so direct, that all and every one of my negro slaves, male and female, with their increase, shall be sent to Africa, under the direction and superintendence of the American Colonization Society, there to become and remain a free people. And for this purpose it shall be the duty of my executors hereinafter named, to take charge of all my said slaves, and, if necessary, hire them out from time to time, until a sufficiency of assets may be collected to defray their expenses to Liberia, in Africa, as well as a sufficiency for their support for six months after their arrival upon that continent. My slaves now amount to sixteen in number ; but it is my will and desire that all slaves belonging to me at my death, with their increase, shall be embraced within the provisions of this second clause, so as to be sent to Africa. In the third place, I give and bequeath to my esteemed man, Frank, all my books and maps, but, to be held, in the mean time, by my executors, as trustees, for his

use, until such time as the said Frank shall be legally competent to take and hold said books and papers as a free man.   In the fourth place, it is my will and desire that my executors shall proceed immediately to collect (so far as they can) all the debts due my estate, and to sell all my property (my said negro slaves, books and maps being always excepted) whether real or personal, without giving more than six months' notice or twelve months' credit, and realize the proceeds as soon as may be, and, after paying all necessary expenses and settling up all the affairs of my estate, to convert all the surplus and residue of my estate into suitable funds to be remitted to Africa for the use and benefit of my said negroes on their arrival on that continent. And I hereby give and bequeath such residuary part of my estate as may remain after the payment of any just debts and necessary expenses to and for the use and benefit of my said negroes, after their removal out of this state and their manumission in foreign parts, to be equally divided among them."   *   *   *   And, lastly, to carry the above provisions and bequests into full and entire effect, executors are nominated and appointed by the testator.

It will be seen that the provisions of this will are plain, simple and without complication, easy of execution, and the intention of the testator ought to be carried into effect, unless that intention is subordinate to, and controlled by, the laws and policy of this state, which obtained in 1842 and subsequently.   The rights of the respective parties were fixed at the moment of the death of the testator, by the law in force at the time.   If the will was then void and inoperative the rights of the heirs of the deceased became vested.   This will depend upon the view we may take of the facts before us.   The testator died in April, 1864, and it appears, that sometime prior to that date, the federal lines had been about eight miles north of the place in question, whereon the appellants resided, and the Confederate lines had been some twenty miles south of their residence, though it seems both parties scouted through that section of coun-

try, the federals, we infer, doing so the more frequently, and often coming upon the plantation of the deceased. This locality, while not then wholly within the federal lines, was accessible thereto, and remained subject to the general control and influence of the federal authorities. The military power of the Confederacy gradually receded from that section and never returned. Confederate civil officers, it is true, as in other counties all over the state, continued to discharge their functions until others were appointed, but it may be said that long before the death of the testator, freedom had come permanently to his slaves. They remained upon the place, and remain there still, but they were as free to go as to stay. Slavery was no longer enforced as to them. They were substantially subject to the power and influences of the federal authorities. The laws of slavery were to them at an end. We infer that they purposely clung to the premises, with the view of succeeding to the title and ownership under the will. If, as to the appellants, the policy of freedom was not in April, 1864, in full operation, certainly the laws and conditions of slavery had long before then become inoperative and were never after in force. We have not held that the proclamation of the president was effectual for freedom beyond emancipation in fact, nor that it did not take place until the adoption of the constitution of 1865, but that this is a practical question, or one of fact, in its application to individuals and sections. The constitution of 1865 does not fix the date of emancipation, but it declares slavery to have been before then destroyed. Hence, we sometime since, upon reflection, concluded and declared the better rule to be, that freedom was practical to individuals and localities. In this view, we are of the opinion, that the policy of freedom embraced and prevailed over the parties and interests in this controversy. Coupled with our view of the agreed state of facts, it should be added here, that the trust in this case is not determined, nor executed ; distribution has not been made, and the estate is still unsettled in the hands of the executor, who, by his petition,

seeks the advice and action of the proper court for his guidance in the premises.

An important, if not decisive, rule is found in Leiper v. Hoffman et al., 26 Miss. 415. Title to real estate had been conveyed to the complainant therein, being, at the time of such conveyance, a slave, jointly with one Winscott, a free white person. The then slave, having become free, filed a bill to obtain title to said lands. The court in that case declared this doctrine: "It is contended that the complainant took nothing by the deed to her and Winscott, because she was a slave at the date of it. It is not necessary to decide what would have been the effect of the deed if it had been made in her name alone, she being a slave, but her legal owner treating her as free, and her freedom having been subsequently established. If the deed was inoperative. to convey any legal or equitable estate to her *in presenti,* it was still effectual as a conveyance of the legal title to Winscott, and it was competent for him to hold the legal title in trust for her. Her right of present enjoyment might be prevented by her condition of slavery, but if the trust continued until that difficulty was removed, by her admission to the rights of a free person, her rights as a *cestui que trust* would then immediately vest, and she would be entitled to enforce them against the trustee. While she was a slave, her rights were suspended, and no one could interfere with them but her legal owner. Here that person freely acquiesces in her claims, both before and since the establishment of her freedom, and no other person can question her rights acquired under the deed. She is, therefore, entitled to claim the benefit of the trust; and, if the trustee has aliened the trust property, it is chargeable, in the hands of any one into whose possession it has come, with legal notice of her claim." The same doctrine is more emphatically pronounced, on facts less strongly appealing to favorable consideration than in the case before us, in 17 La. Ann. (1865) 174. Leiper v. Hoffman finds its almost precise parallel, when papists in Great Britain were under very similar

disabilities to our slaves, and it was held, in Hill v. Filkins, Lucas, 481, 536 (Gilb. on Dev. 157), that a papist conforming at eighteen is capable of taking by devise made when under that age. To give point and force to this authority, it should be stated that the English statute of 11 and 12 William III rendered papists "incapable to take, by purchase, any lands, or profits out of lands ; and all estates, terms, and any other interests or profits whatsoever out of lands, to be made, suffered or done to or for the use of such person, or upon any trust for him, or to or for the benefit or relief of any such person," are declared by the statute to be utterly void. Not altogether unlike these cases is that of an infant unborn, which, says Gilbert, "was formerly held void, for that, the infant not being born, there was no person to take ; but it is now held good, because the law shall intend that the devisor did intend it to him when he should be born, so that it works in the nature of an executory devise ; and where it appears that the testator did not intend it to be executed presently, then it shall wait." Gilb. on Dev. 13.

Another pertinent and decisive rule is declared in Craig v. Leslie et al., 3 Wheat. 563, wherein, upon reason and the precedents, it is held, that equity considers land directed in wills or other instruments, to be sold and converted into money, as money ; and that where the whole beneficial interest in the land or money, thus directed to be employed, belongs to the person for whose use it is given, a court of equity will permit the *cestui que trust* to take the money or the land at his election, if he elect before the conversion is made. The devisee in that case was an alien. The court said, " The common sense of mankind would determine that a devise of money, the proceeds of land directed to be sold, is a devise of money, notwithstanding it is to arise out of land ; " and the alien beneficiary, though he could not take real estate as such, was permitted in that case to take the property as personalty. It is settled, that if the intent of the testator appears to have been to stamp upon the pro-

ceeds of the land described to be sold the quality of personalty, not only to subserve the particular purposes of the will, but to all intents the estate, is considered to be personal. Yates v. Compton, 2 P. Wm. 308. Within this convenient doctrine of equity, the conversion of the property in litigation into money may be dispensed with, at the election of the beneficiaries, their claim being otherwise sustained.

One other rule will conclude the series by which we think the case at bar is determined. We refer to the maxim that the true construction of wills is the intention of the testator. Intention is declared to be the polar star for the construction of wills ; and it has been said to be a law for the same purpose. When it can be ascertained, effect will be given to the intention of the testator, and for this purpose the whole will must be considered, and, if necessary, attendant and surrounding circumstances. Wigram on Wills ; Smith's Executory Interests, § 580 ; Story's Eq. Jur., § 1068 *et seq.* ; 32 Miss. 108 ; 24 ib. 343 ; 37 ib. 114 ; 36 ib. 564 ; 40 ib. 729 ; 43 ib. 437 ; ib. 641 ; ib. 603. It is apparent upon the face of the will under consideration, that there were in the mind of the testator two paramount purposes, to which he gave clear and decisive expression, viz.: the freedom of his slaves, and their pecuniary benefit. It is unmistakable that he intended to invest them with freedom, and with his entire estate remaining after the payment of his debts and the expenses of its settlement.

It only remains to inquire whether effect may be given to devise in the case at bar, without requiring the devisees to repair to Africa. No doctrine is better settled than that effect is given to bequests, discharged of conditions of various sorts, in restraint of marriage, illegal, immoral, in contravention of public policy, etc. Story's Eq. Jur., §§ 274, 291 ; ib. 1313, 1317 ; 3 Redfield on Wills, 494 ; 2 ib., title Conditions. And in support of this rule it is only necessary to refer to the authorities. Removed to Liberia, these parties would then occupy the relation of aliens only, with the complete and unobstructed right to take and hold personal

property (3 Wheat. 563), and real estate, if residing in this state. Code, 320. In Liberia and in receipt of the bequest in controversy, their right to return and enjoy their fortune would be unquestionable. To require these people to remove to a distant land for a mere formality, as it might be, would seem to be an unnecessary hardship, and in our opinion it would be against a wise public policy to impose upon citizens a condition of emigration in order to accept a bequest of money, not imposed by the testator, but by a prior law since abrogated. The appellants not only can take this estate discharged of an unjust and impolitic requirement, but this branch of the case at bar is within Craig v. Leslie, *supra*. But, further, one of the objects of the testator is accomplished in the freedom of his slaves without transportation to foreign parts, for it is evident removal to Africa was not a condition precedent in the mind of the donor, but a mode of giving freedom, a pre-requisite, imposed by law, which the will sought to obviate. The boon of freedom, however, has been otherwise secured, and it devolves upon the courts to give effect to the devise according to the intent of the devisor, if consistent with the established rules of law.

The decisions of this court upon this class of cases have been limited. In Hoover v. Brem, Exr., 43 Miss. 603, we gave effect to a devise of money to a slave, the fund having been placed by the testator in the hands of trustees, and the trust remaining until emancipation as the result of the late war. The legislation and adjudications of this state upon the subject of slavery, from 1822 to the present time, were very fully reviewed in Berry, Admr., v. Alsop, Admr., 45 Miss. 1. In that case the right to remove slaves to another state and there manumit them, and the right of such freed persons to property in Mississippi, devised to them by their late master, were vindicated. The adjudications in this state were all referred to and those of Heirn, Exr., v. Bridault, 37 Miss. 209, and Mitchell v. Wells, ib. 235, dissented from.

Upon the whole case, we are quite content that the will and the devise be sustained, discharged of the necessity of removal to Africa, and that the appellants take the estate, subject to the debts and expenses of settlement. The decree ordering a sale of the property is reversed, and the cause remanded for further proceedings, in conformity with the foregoing views.